**NUCO PLASTICS, INC., Appellant,**

**v.**

**UNIVERSAL PLASTICS, INC.; Lander Products, Inc., Appellee.**

[Cite as *Nuco Plastics, Inc. v. Universal Plastics, Inc.* (1991), 76 Ohio App.3d 137.]

Court of Appeals of Ohio,
Lake County.

No. 90–L–15–171.

Decided Oct. 28, 1991.

*Frank R. Brancatelli,* for appellant.

*F. Thomas Vickers,* for appellee.

NADER, Presiding Judge.

This appeal is from the trial court's judgment in favor of appellee, Lander Products, Inc., on the breach of contract claim brought by appellant, Nuco Plastics, Inc.

The contractual dispute arose from the efforts to produce a duplicate of a "door guard" brought to this country from Italy. This guard is a plastic reflective piece attached to automobiles, between the front and rear doors. William Brunelle and George Tirak, both with experience in the plastic

injection molding industry, incorporated Lander Products, Inc. for the purpose of marketing these "door guards."

These men approached Nuco Plastics with an original "door guard" from Italy, and asked Nuco to submit a bid for the development of a mold and the mass production of the product. On August 8, 1986, Nuco Plastics submitted a bid with a price per part per thousand parts quoted according to the number of parts ordered, with the price reduced for a second order. The number of parts ranging from 100,000 to one million.

Nuco Plastics, principally owned by Eugene and Andrew Zarlinski, subcontracted the development of the tooling and mold to MTZ Corporation, an S corporation with three shareholders: George Tirak, and Eugene and Andrew Zarlinski. MTZ Corporation then contracted with Turbo–Mold for the required tooling and molding work. George Tirak is a part owner of Turbo–Mold as well.

The cost of the mold is "amortized" over the life of the contract, by apportioning a percentage of the price per part to tooling and molding costs. Lander Products (partly owned by Tirak) would pay Nuco an amount per part, and Nuco would then transfer a portion of this payment to MTZ Corp. (partly owned by Tirak) to pay for MTZ's work on the mold. MTZ Corp. would then transfer this payment to Turbo–Mold (partly-owned by Tirak) to pay for its work on the mold.

On August 21, 1986, Lander sent purchase order number 00242 to Nuco, ordering 500,000 parts at a price of $235 per one thousand parts. Subsequently, changes were requested by Lander and changes in the composition of the material were made by Nuco. However, the exact sequence of what transpired next is unclear from the facts presented at trial.

On November 26, 1986, the first sample part was submitted to Lander, which then requested changes to be made in the design of the product, adding a "rib" and angling the "flap." This required a secondary production line in order to accomplish this angling. On January 18, 1987, Lander requested that the rib be removed, and that the flap be shortened. Each of these requested changes added to the tooling cost incurred in the development of the mold.

At trial on cross-examination, an officer of Nuco Plastics testified that Lander was informed "in late 1986—early 1987" that Nuco would be unable to produce 500,000 parts at 23.5 cents per part. Cross-examination also elicited the following statement:

"Q. After the purchase order was issued, Nuco determined that it was unable to duplicate the low density polyethylene; is that correct?

"A. Yes, with the filler in."

Instead of the low density polyethylene, the material Nuco used was a rubber, modified polypropylene. This change in material increased the cost of the parts, and "in late 1986—early 1987" (from exhibit G the date appears to have been November 6, 1986) Nuco submitted a new proposed price per part of 500,000 at 35 cents per part. Appellant argues on appeal that the change in material composition was necessitated by the change in design criteria by Lander.

The proposed price per part was again changed by Nuco to 40 cents per part. Thereafter, on May 14, 1987, Lander sent purchase order number 000210 to Nuco, ordering 105,000 parts at the price of 40 cents per part. Appellant subsequently invoiced appellee for 500,000 parts at 40 cents per part, and appellee refused to pay for or accept the order.

On December 2, 1988, Nuco Plastics filed its complaint alleging breach of contract against appellee and Universal Plastics. This breach is based upon the assertion that the parties had an agreement requiring a minimum purchase of 500,000 parts to cover the cost of developing the molds. Appellee answered and counterclaimed for replevin of the molds, which it claimed to have a legal right to possess.

On August 3, 1989, Nuco Plastics filed an amended complaint naming Barry Friedman and William Brunelle as additional party defendants. The trial court's judgment entry of September 22, 1989 granted summary judgment in favor of Universal Plastics, and dismissed the amended complaint as being untimely filed without leave. After a two-day trial, the trial court filed its opinion and judgment, finding in favor of appellee on Nuco's complaint, and in favor of appellant on Lander's counterclaim. It is from this decision that appellant now appeals, raising the following assignments of error:

"1. The trial court erred in concluding that Nuco unilaterally repudiated the contract when it realized that it could not profitably produce the guard at the original price.

"2. The trial court erred in concluding that Nuco was not the real party in interest as to the ownership of the mold.

"3. Trial court erred in concluding that the contract had not been modified by agreement between the parties for a new price for the goods being sold."

In its first assignment of error, appellant argues that the trial court erred in finding that the repudiation of the contract by appellant resulted in the contract for 500,000 parts at 23.5 cents no longer existing. The trial court found that the actions by the parties, mailing a price list and a corresponding purchase order, constituted a sufficient meeting of the minds to form a contract.

Appellant relies on *Am. Bronze Corp. v. Streamway Prod.* (1982), 8 Ohio App.3d 223, 228, 8 OBR 295, 300, 456 N.E.2d 1295, 1301, which cites *Flavorland Industries v. Schnoll Packing Corp.* (1979), 167 N.J.Super. 376, 400 A.2d 883, for the proposition that "repudiating a contract for the sale of goods does not rescind the contract, but constitutes a breach of it."

Appellant argues that, even if its conduct constituted a repudiation of the contract, the contract was still in existence. However, an initial determination must be made as to whether appellant's conduct constituted a repudiation of the contract. *Am. Bronze Corp., supra,* 8 Ohio App.3d at 228, 8 OBR at 300, 456 N.E.2d at 1301, states:

"Official Comment 1 to R.C. 1302.68 states that: 'anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.' Such indication must be a definite and unequivocal refusal to perform." (Citations omitted.)

Further, Official Comment 2 to R.C. 1302.68 indicates that a demand for performance not required of the other party by the terms of the contract does not by itself act as a repudiation. A demand for additional payment, without a refusal to perform until the demand is met, is not a repudiation of the contract. See *Marr Enterprises, Inc. v. Lewis Refrigeration Co.* (C.A.9, 1977), 556 F.2d 951; and *Gronvall v. Petersen* (Sept. 8, 1989), Ottawa App. No. 24202, unreported, 1989 WL 103346. Therefore, the actions of appellant in attempting to unilaterally change the contract price from $235/1000 parts to $400/1000 parts did not repudiate the contract. Instead, this activity should be viewed as a request to enter into a modification agreement.

Appellee's response to the first assignment of error was to rely on the deference given to the trial court's finding of fact under *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. However, whether the actions of appellant, which are facts to be found by the trial court, constitute a repudiation of the contract is a question of law. Therefore, no deference needs to be given to the trial court's determination that the contract was repudiated. While we disagree with the trial court's application of the law, this court reaches the same result as the trial court's decision.

While not repudiating the initial contract, appellant's actions are more properly viewed as an offer to modify the initial contract. Appellant's offer to modify, by demanding additional consideration, would cause appellee to feel insecure, thereby providing appellee the right to demand adequate assurance that appellant would still deliver the parts at $235/1000 parts under the initial contract. See R.C. 1302.67(A).

Instead of enforcing the terms of the original contract, appellee agreed to modify the contract. However, appellee did not simply accept appellant's new offer to produce 500,000 parts at a price of $400/1000 parts. Appellee conditionally accepted the offer to modify, changing the number of units from 500,000 to 105,000. Appellant accepted appellee's counteroffer, 105,000 units at $400/1000, by producing and delivering 105,000 parts and accepting $42,000 as payment for those parts delivered.

The above legal description of the transactions between the parties is supported by two additional facts. First, production of the final parts never began until after appellant received the purchase order for 105,000 parts at $400/1000. Second, the original contract contemplated a delivery date in November 1986, and, as stated above, production did not begin until the 105,000 part purchase order was received in May 1987.

Appellant may have properly believed that the contractual relationship of the parties would result in additional parts being ordered. The clauses concerning the ownership of the mold, transferring ownership to appellee after one million parts were sold, but remaining with appellant until two million parts were sold, supports appellant's belief. However, appellee never contractually obligated itself to the greater undertaking that the parties had hoped would be necessitated by the demand for the "door guard."

As such, appellant's first assignment of error correctly points to error in the trial court's finding that the contract had been repudiated. However, the trial court ultimately reached the proper result. Accordingly, appellant's first assignment of error is without merit.

In appellant's second assignment of error, it contends that the trial court erred in finding that appellant was not the real party in interest with regard to the ownership of the mold. On cross-examination, Eugene Zarlinski, an owner of Nuco Plastics, Inc., was examined on answers given in his deposition, in which he stated that Nuco owed no money for the molds, and that MTZ never charged Nuco for any work. On re-cross-examination Eugene Zarlinski stated that MTZ owned the tooling and the mold.

Andrew Zarlinski testified that the tooling was subcontracted to MTZ, which in turn subcontracted with Turbo–Mold for the tooling. The cost of the tooling was computed into the cost of the parts, and a percentage of the money received for the parts would be transferred from Lander to Nuco, then from Nuco to MTZ, and finally from MTZ to Turbo–Mold.

The trial court stated in the judgment entry the following:

"Nuco's arrangement with MTZ required that upon receipt of any money from Lander, it was to forward a proportionate share to MTZ for tooling costs, whereupon MTZ paid Turbo-Mold."

Based upon this finding the trial court held that appellant was not the real party in interest to bring a cause of action for the costs of the required tooling. The trial court seems to indicate that had there been a written contract evidencing Nuco's "arrangement" with MTZ, such as a bill, then Nuco could properly bring this cause of action. The real party in interest according to the trial court is the "owner" of the mold, Turbo–Mold.

*Lyons v. Chapman* (1931), 40 Ohio App. 1, 6, 178 N.E. 24, 26, states:

"We believe that the proper test to determine who is the real party in interest is ascertainable from the answer to the question: Who would be entitled to damages?"

Turbo–Mold would be entitled to damages, but not from appellee as Lander was not a party to the subcontract between MTZ and Turbo–Mold. The trial court's approach requires Turbo–Mold to sue MTZ, which would then bring suit against Nuco, and finally Nuco would bring suit against Lander. Instead, the answer to the above question is that Nuco would be entitled to damages, as appellant obligated itself under its "arrangement" to make payments for the tooling. The "arrangement" is not conditioned on Lander's payment, but merely anticipates revenue from those payments. Appellant is the real party in interest, and the trial court erred in determining otherwise. This represents merely harmless error, due to our determination of the first and third assignments of error.

Accordingly, appellant's second assignment of error is without merit.

■ In its third assignment of error, appellant maintains that the trial court erred in finding that the contract had not been modified by the parties. Based on our determination of the first assignment of error, we agree that the contract had been modified.

However, appellant argues that only the price has been modified while the number of units remains at 500,000. Appellant asserts that the contract was modified by appellee's silent acquiescence to the tooling and composition changes made by appellant in an attempt to satisfy Lander's design needs. Appellant relies on the good faith requirement under R.C. 1302.01(A)(2), and argues that when judged against this standard, the parties modified the contract.

A review of the record demonstrates a complete failure by appellant to put forth evidence proving this modification of the contract. There were changes made in the design of the "door guard" which resulted in tooling changes.

However, appellant puts forth no evidence as to the amount of the increased cost. Further, appellee presented evidence that initial tooling changes are accomplished rather cheaply by the use of an inexpensive temporary mold. Moreover, the evidence is not clear as to the cause of the change in material composition, *i.e.*, whether it was necessitated by design changes or resulted from appellant's inability to produce the original composition.

Both parties were aware that design changes would increase the tooling costs, but no evidence was presented on any agreement between the parties as to who should pay the increase. Additionally, no evidence was put forth to establish the usual and customary practice in the industry, nor to establish any prior dealings between the parties.

Appellant established that changes were made in the design, which resulted in increased costs, but failed to demonstrate the amount of the increase or any agreement to pay for the increase. Accordingly, the trial court properly found that the actions of the parties did not result in the contract for the purchase of 500,000 units being modified only with respect to the price per unit. Therefore, appellant's third assignment of error is without merit.

Based upon the foregoing analysis, the decision of the trial court is hereby affirmed.

*Judgment affirmed.*

BAIRD and MAHONEY, JJ., concur.

WILLIAM R. BAIRD, J., of the Ninth Appellate District, sitting by assignment.

EDWARD J. MAHONEY, J., retired, of the Ninth Appellate District, sitting by assignment.