**PC COM, INC., Plaintiff,**

v.

**PROTEON, INC. and Jack Dutzy, Defendants.**

**No. 94 Civ. 5537 (WCC).**

United States District Court, S.D. New York.

Nov. 7, 1995.

Singer Netter Dowd & Berman (Edward M. Berman, of counsel), New York City, for Plaintiff.

Boyar, Higgins & Suozzo, P.A. (James J. Higgins, of counsel), Morristown, NJ, for Defendants.

WILLIAM C. CONNER, Senior District Judge.

Defendant Proteon, Inc. ("Proteon") has moved for summary judgment dismissing plaintiff's claims and granting Proteon's counterclaim. Defendant Jack Dutzy ("Dutzy") has moved to dismiss plaintiff's claim against him for lack of in personam jurisdiction. For the reasons stated below, defendants' motions are denied, with leave to renew in part upon completion of discovery.

## BACKGROUND

Plaintiff PC COM, Inc. ("PC COM") is a Florida corporation maintaining a principal place of business in Elmsford, New York. Defendant Proteon is a Massachusetts corporation maintaining its principal place of business in Westborough, Massachusetts, and is duly qualified and licensed to do business in New York. Defendant Dutzy is an individual residing in New Hampshire employed by Proteon during times relevant in this case. This motion arises out of an action to recover damages for breach of contract and for tortious interference with contract, and a counterclaim for unpaid amounts due under the contract. This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

Defendant Proteon has been in the business of manufacturing and selling electronic devices known as token ring adapter network interface cards ("NICs") and networking equipment, enabling the contemporaneous use by many computers of a central computer containing a central memory and programs (called a "file server"). This structure is known as a "network," and the network

within a company is called a "local area network" ("LAN").

Proteon has sold LAN products through traditional channels, namely, through its own LAN Products Division sales personnel and sales offices. Traditional channel sales are principally to national distributors who, in turn, resell the products through intermediate dealers to ultimate consumers. Proteon also has had original equipment manufacturer ("OEM") arrangements with other companies to whom Proteon sells its LAN products bearing the Proteon trade name and logo for use, as well as for resale.

While at a computer trade show in November 1992, Proteon's then Director of OEM Sales, Robert Otten, approached PC COM to inquire whether PC COM was interested in becoming an OEM purchaser and reseller of Proteon products. Thereafter, Proteon and PC COM entered into an OEM Purchase Agreement, dated March 17, 1993 (the "Agreement"), for the purchase and sale of Proteon products to PC COM.

The parties operated amicably under the first year of the Agreement, which ended March 15, 1994. Both parties realized profit from the relationship, and no major disputes are on record.[1] Early in the second year, however, a disagreement arose regarding pricing. PC COM alleges that, on June 16, 1994, one of Proteon's sales support personnel telephoned PC COM to advise that defendant Dutzy, then Director of LAN Product Sales, had placed a "pricing hold" on PC COM orders.[2]

On June 17, 1994, Lisa Huber, a Proteon sales support person, sent a memo by fax to PC COM advising that Proteon would not honor an order received from PC COM due to the pricing dispute. Specifically, the memo indicated that Proteon would not honor the purchase order unless PC COM agreed to pay $432.25 per ISA NIC instead of the "agreed upon price" of $215.00 per card,[3] which had been the price paid during the first year of the Agreement.[4] As a result of this pricing dispute, PC COM withheld payments on several orders already received, with the first of these payments becoming due on June 20, 1994, pursuant to a 30-day credit arrangement. PC COM claims that Proteon's actions on June 16–17, 1994 constituted a breach and termination of the Agreement, thus warranting discontinued performance (i.e., payment) by PC COM. Proteon denies that its actions constituted a breach, and counters that PC COM's refusal to pay for the past orders already received and overdue (as of June 20, 1994) constituted a breach of the Agreement. Proteon and PC COM exchanged a volley of letters attempting to resolve their differences, all to no avail.

1. There is a dispute in this case as to whether or not PC COM fulfilled certain minimum purchase requirements and complied with labeling requirements during the first year, but these claims arose during the second year of the Agreement at the time this action commenced.

2. Dutzy had been an employee of Proteon until some time in 1992. He became involved with Proteon again when he received an offer of "contract assignment" with Proteon on May 11, 1994, which he accepted on May 12, 1994.

3. PC COM claims that Proteon agreed to a price of $215.00 per card for the duration of the Agreement:

In June 1993, Otten phoned [Friedman] to urge that [PC COM] purchase additional ISA NICs to bolster Proteon's sales for its quarter ending June 30th [1993]. It was during that conversation when it was agreed that the price per ISA NIC was then lowered to $215.00, and that that was to remain the maximum per ISA NIC price from then on. And so it was. We thereby changed in practice the price for such

NICs set forth on Schedule A to the Agreement. While that was the maximum price, Proteon charged PC COM the still lower price of $195.00 per ISA NIC on a number of special orders.

*Friedman Aff.*, p. 7, ¶ 18. Proteon denies that the $215.00 per card price was to apply to the second year.

4. The message read as follows:

DEAR STEVE, WE WISH TO THANK YOU FOR YOU PURCHASE ORDER NUMBER 61694A BUT REGRET TO INFORM YOU THAT UNTIL SUCH TIME AS A RESOLUTION IS MADE REGARDING PRICING, WE CANNOT HONOR YOU ORDER. IF YOU WOULD KINDLY REVISE YOUR ORDER USING A 35% DISCOUNT ($665.00 LIST—$432.25 NET) WE WILL BE HAPPY TO SHIP IT. IF YOU HAVE ANY QUESTIONS PLEASE FREE TO CALL JACK DUTZY, DIRECTOR OF SALES LAN PRODUCTS DIVISION AT 508–898–2800, EXT. 2213. THANK YOU. /s/ Lisa.

On July 5, 1994, PC COM filed its complaint in the Supreme Court for the State of New York, Westchester County. PC COM sought compensatory damages of no less that $5 million from Proteon for its alleged breach of the Agreement and compensatory damages of no less that $5 million and punitive damages in the sum of $500,000 from Dutzy for his alleged intentional interference with PC COM's contractual advantages.

Since the dispute, PC COM was able to link up with a competitor of Proteon, namely Olicom Corp. ("Olicom"), a Danish manufacturer of LAN products similar to those manufactured by Proteon. On July 11, 1994, Friedman wrote a memorandum addressed to PC COM's existing customers "to coax them to continue to do business with PC COM, and to now buy Olicom manufactured token ring adapter products instead of Proteon manufactured products." *Friedman Aff.*, p. 18, ¶ 56. The letter reads:

> As you may know, PC COM does not manufacture its Token Ring products. We have relied on Proteon to provide us with industry leading products. Our value added includes an overwhelming commitment to Unparalleled Customers Support ... of its products that carry the PC COM name. The recent chaos at Proteon has impacted our ability to provide these functions at the high level we insist on.... In light of these daunting facts, I have elected to terminate PC COM's OEM agreement with Proteon. Quite frankly, I cannot in good conscious [sic] continue to recommend products manufactured by this company nor can I ask our salespeople to. I am concerned that Proteon's woes would reflect poorly on PC COM.... That is why, we've negotiated and signed an OEM agreement with Olicom to provide the industry's highest performing NIC card. Olicom's sentiments towards Customer Satisfaction reflect our own.... I now ask you to consider this same dilemma. It seems a perfect time to switch. All trends indicate you and your clients may be forced into such a decision soon anyway....

Ex. F (emphasis added). Proteon points to the underlined language as an admission that

PC COM, and not Proteon, terminated the Agreement. PC COM describes this language as just "puffing" to customers and in no way an admission that it terminated the Agreement.

On July 29, 1994, Proteon and Dutzy removed the action from state court to the United States District Court for the Southern District of New York. On August 22, 1994, Proteon and Dutzy filed an answer to the complaint, denying liability to PC COM and raising several affirmative defenses. In addition, Proteon counterclaimed against PC COM for $347,867.37 due for products sold and shipped to PC COM between February 16 and June 29, 1994, and for damages arising out of PC COM's breach of the Agreement by selling other than private label products. PC COM filed a reply to the counterclaim denying that it breached the Agreement and asserting several defenses, including a right to setoff its damages against the $347,867.37 allegedly due Proteon.

In April 1995, Proteon and Dutzy filed this motion seeking (1) summary judgment on PC COM's claim for breach of contract against Proteon, (2) summary judgment on Proteon's counterclaim against PC COM for unpaid charges of $347,867.37, and (3) dismissal of PC COM's claim for tortious interference with contract against Dutzy for lack of in personam jurisdiction.

### DISCUSSION

**I. PC COM's claim against Proteon for breach of the Agreement**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c). A court may grant summary judgment "only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact." *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir.1990). On a motion for summary judgment, all evidence must be viewed and all

inferences must be drawn in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 45 (2d Cir.1988).

▇▇▇ Under New York choice of law principles applicable in this diversity action, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the contractual selection of governing law is generally determinative so long as the chosen state has sufficient contacts with the transaction, absent fraud or violation of public policy. *See CBS, Inc. v. Tucker*, 412 F.Supp. 1222, 1226 n. 5 (S.D.N.Y.1976). The Agreement provides that "[t]he validity, performance and all matters relating to the interpretation and effect of this agreement and any amendments hereto shall be governed by the laws of the State of Massachusetts." Ex. A, ¶ 20(f). The parties do not dispute that Massachusetts law should control. When a transaction bears a reasonable relation to this state and also to another state, the parties may agree that the law either of this state or of such other state shall govern their rights and duties. *N.Y.U.C.C.* § 1–105(1) (McKinney 1995); *Eastern Artificial Insemination Coop. Inc. v. La Bare*, 210 A.D.2d 609, 619 N.Y.S.2d 858, 859 (1994); *Capital Nat'l Bank of New York v. McDonald's Corp.*, 625 F.Supp. 874, 879–80 (S.D.N.Y.1986); *Assoc. Metals & Minerals Corp. v. Sharon Steel Corp.*, 590 F.Supp. 18, 20 (S.D.N.Y.), *aff'd*, 742 F.2d 1431 (2d Cir.1983). We see no reason to depart from the parties' contractual choice of law. In the instant case, the matter in controversy has sufficient relation to Massachusetts. Therefore, Massachusetts law will control all matters relating to the interpretation and effect of the Agreement.

The gravamen of PC COM's claim is that Proteon breached the Agreement—or committed an anticipatory breach—by refusing to deliver on purchase orders unless PC COM agreed to pay a unilaterally increased price. Proteon offers two principal arguments for granting summary judgment in its favor on PC COM's claim. First, Proteon asserts that it did not breach the Agreement, and that PC COM itself was in breach of, and

then terminated, the Agreement. Second, Proteon argues that, even assuming, *arguendo*, that it did breach the Agreement, provisions in the Agreement preclude claims for consequential damages, thus warranting summary judgment. We discuss each argument below.

## A. Whether or not Proteon breached the Agreement

▇▇▇ Proteon characterizes its communications with PC COM on June 16–17, 1994 as justified and lawful negotiations to get PC COM to comply with pricing guidelines set forth in the Agreement. Proteon reasons that, because its actions as a matter of law could not constitute a breach, PC COM was the party that breached the Agreement by intentionally withholding payments beyond the 30–day credit allowance.

▇▇▇ Proteon raises three independent grounds for finding that PC COM, and not Proteon, breached the Agreement. First, Proteon asserts that it could not have breached the Agreement by refusing on June 16–17 to honor PC COM's order because, under the terms of the Agreement, PC COM was not entitled to the $215.00 per card price assumed in its purchase order. Defendants correctly assert that Proteon's June 17 fax demanded prices set forth in the Agreement. Furthermore, the Agreement contains a provision that "[n]o modification, amendment, recession, waiver or other changes shall be binding upon Buyer or Proteon unless and until made in writing and signed by authorized representatives of Buyer and Proteon." Ex. A, p. 8, ¶ 12. However, in Massachusetts it is a settled principle of law that a written contract may be varied by subsequent oral agreement based upon a valid consideration. *Cambridgeport Sav. Bank v. Boersner*, 413 Mass. 432, 597 N.E.2d 1017, 1021 (1992); *First Pennsylvania Mortgage Trust v. Dorchester Sav. Bank*, 395 Mass. 614, 481 N.E.2d 1132, 1138 (1985). PC COM's alleged agreement to purchase additional goods as purportedly requested by Proteon would constitute valid consideration for oral modification

of prices.[5] Furthermore, a provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract. *Cambridgeport Sav. Bank*, 597 N.E.2d at 1022; *First Pennsylvania*, 481 N.E.2d at 1138–39. In addition, mutual agreement on modification of the requirement of a writing may be inferred from the conduct of the parties and from the attendant circumstances of the instant case. *First Pennsylvania*, 481 N.E.2d at 1139. Proteon does not controvert PC COM's allegations that Friedman's conversation with Otten established an oral modification to the Agreement, other than to assert that the $215.00 per card price was to apply only to the first year. Viewing all factual disputes in the light most favorable to PC COM, we assume that Friedman and Otten did orally modify the Agreement so that the prices set forth in the Agreement were not binding. The fact that the parties operated in the first year under a pricing structure that differed from that set forth in the Agreement supports an inference that the written Agreement had indeed been modified.[6] Therefore, Proteon cannot rely on the prices quoted in the Agreement to refute PC COM's allegations that it breached the Agreement (as modified orally and in practice) by refusing to deliver goods at the allegedly agreed upon price of $215.00 per card.

■ The second ground asserted by Proteon for finding that it did not breach the Agreement is that, even assuming that it had agreed to sell products at $215.00 per card, Proteon's actions on June 16–17 constituted nothing more than an attempt to renegotiate the price—in no way to be taken as repudiation or breach. Proteon claims that it was privileged to renegotiate. However, Proteon cites no Massachusetts case law in support of this privilege. Proteon cites an Ohio case in support of its assertion that an attempt to renegotiate does not constitute repudiation. *See Nuco Plastics, Inc. v. Universal Plastics, Inc.*, 76 Ohio App.3d 137, 601 N.E.2d 152 (1991). This case provides that "[a] demand for additional payment, *without a refusal to perform until the demand is met*, is not a repudiation of the contract." 601 N.E.2d at 154 (emphasis added). However, PC COM has alleged that Proteon did in fact refuse to perform until its demand that PC COM meet the increased price was met. For this reason, among others, this case does not avail Proteon. PC COM cites a New York case more in point. In *A.W. Fiur Co. v. Ataka & Co.*, 71 A.D.2d 370, 422 N.Y.S.2d 419 (1979), the court held that "[a]lthough the contract conferred upon [defendant] the 'absolute and exclusive right to reject any orders for any reason whatsoever,' such a contract does not import the right arbitrarily to refuse to accept orders." 422 N.Y.S.2d at 422. The court noted that "[t]here is an obligation in every contract requiring the parties to deal in good faith with each other." *Id.* Under Massachusetts law, every contract for a sale of goods imposes an obligation of good faith in its performance. *See* M.G.L.A. 106 § 1–203 (1990).[7] Whether or not certain "negotiations" constitute breach of a duty to sell at certain prices depends on the circumstances. Therefore, summary judgment is precluded.

The third ground asserted by Proteon for finding that it did not breach the Agreement

---

5. "In June 1993, Otten phoned [Friedman] to urge that [PC COM] purchase additional ISA NICs to bolster Proteon's sales for its quarter ending June 30th [1993]. It was during that conversation when it was agreed that the price per ISA NIC was then lowered to $215.00, and that that was to remain the maximum per ISA NIC price from then on." *Friedman Aff.*, p. 7 ¶ 18.

6. Even viewing the evidence in a neutral light, there is reason to believe that the Agreement, as written, did not reflect the parties' agreement as to pricing. Both parties agree that the $215.00 per card price was to apply at least to the first year. However, the Agreement indicates that the $215.00 per card price applies only for certain volume discounts, with a minimum volume of 10,000 units. There is no dispute that PC COM did not achieve the 10,000 level, and yet there is no claim that $215.00 was not the proper price per card in the first year. (There is some dispute as to whether or not PC COM achieved the 4,400 minimum that both parties agree was the contracted minimum level for the first year, but the parties agree that the 4,400 minimum was the agreed upon target, not 10,000 as indicated in the Agreement.)

7. In Massachusetts, the Uniform Commercial Code was enacted into law in chapter 106 of the Massachusetts General Laws.

is that it was entitled to withhold shipments from PC COM because PC COM was overdue in its payments. The Agreement provides that Proteon may withhold future shipments in the event that PC COM fails to make payments when due. Ex. A, p. 3, ¶ 7. However, at the time that PC COM alleges that Proteon breached the Agreement—i.e., on June 16–17, 1994—PC COM was not in default of any payments. Proteon does not allege that there was a default prior to June 20. Therefore, Proteon's professed excuse for its refusal to deliver any shipments after June 20 could not justify such a refusal before that date.

Proteon places great reliance on Friedman's letter to PC COM customers where PC COM purportedly admitted that PC COM, and not Proteon, terminated (and therefore breached) the Agreement. PC COM emphatically denies breaching or terminating the Agreement. Its letter to its customers was a mere sales device which was neither intended nor expected to be seen by Proteon. The letter constitutes, at most, evidence to be considered by the trier of fact. It reflects rather than forecloses a genuine issue of material fact.

**B. Whether PC COM's claims for consequential damages are precluded by the Agreement**

Proteon's second argument in support of its motion for summary judgment on PC COM's claim for damages for breach of contract is that, even assuming that it terminated and breached the Agreement, provisions in the Agreement preclude an award for consequential damages:

> Neither Buyer or Proteon shall by reason of the termination or non-renewal of the OEM relationship hereby created be liable to the other for compensation, reimbursement or damages on account of the loss of prospective profits on anticipated sales or on account of expenditures, investments, or leases on commitments in connection with the businesses or goodwill of Proteon or Buyer.

Ex. A, p. 8, ¶ 22(7). In addition:

> In no event shall Proteon be liable for any special, incidental or consequential damages, or for commercial losses from any cause including, but not limited to loss of profit or revenues, whether or not Proteon has received notice of the possibility or certainty of such damages or losses.

Ex. A, p. 4, ¶ 12.

■ Proteon cannot avail itself of either of these provisions. The limitation of liability provision in paragraph 22 of the Agreement does not preclude a claim for consequential damages. The disclaimer that, in the event that the Agreement is terminated by Proteon, Proteon is not liable to PC COM for "compensation, reimbursement or damages on account of the loss of prospective profits on anticipated sales or on account of expenditures, investments, or leases in connection with the businesses or goodwill of PC COM," only applies where Proteon terminates the Agreement "for cause." Ex. A, p. 7 ¶ 22. PC COM claims that the refusal to honor PC COM orders unless PC COM paid "more as an OEM purchaser than 'John Doe' could pay for the same product 'on the street' constituted a repudiation and anticipatory breach of the Agreement by Proteon, excusing further performance by PC COM." *Pl.'s Opp. Mem.,* p. 11. If PC COM prevails on its claim at trial that Proteon unlawfully breached the Agreement, then this limitation on damages does not apply because Proteon's "repudiation" on June 16–17 would not have been "for cause."

■ The disclaimer in Paragraph 12 of the Agreement, according to Proteon, also precludes a claim for consequential damages. However, the cases that Proteon cites in support of the proposition that, under Massachusetts law, liability limiting provisions are enforceable, are not in point because these cases address liability limiting provisions precluding an award for consequential damages in the context of a breach of warranty. This case does not concern a breach of warranty; this case involves a claim for breach of contract based on nonperformance. If this provision were read to preclude a claim for consequential damages in this case, PC COM would have no redress for its alleged damages suffered due to Proteon's nonperformance. In that event, the "remedy [would]

fail of its essential purpose" so that other "remed[ies] may be had as provided in [this chapter]" M.G.L.A. 106 § 2–719(2) (1990). *See* M.G.L.A. 106 § 2–719 cmt. 1 (1990) ("[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available.... Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed."). "Other remedies" available to PC COM for non-delivery or repudiation include lost profits. *See* M.G.L.A. 106 § 2–713 (1990) ("the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental expenses saved in consequence of the seller's breach").

 We cannot hold that, as a matter of law, the parties intended for this provision to preclude an award for consequential damages for anything other than a breach of warranty or a breach of contract arising out of a breach of warranty. Where the language is ambiguous as to the parties' intent, summary judgment is precluded. *See Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992) ("In the past [the Second Circuit has] defined ambiguous language as that which is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" (citing *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987))). Under Massachusetts law, the question of whether a contract term is ambiguous is one of law. *NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28, 32 (1st Cir.1994); *F.D.I.C. v. Singh*, 977 F.2d 18, 22 (1st Cir.1992). *See also Den Norske Bank AS v. First Nat'l Bank of Boston, N.A.*, 838 F.Supp. 19 (D.Mass.1993); *Baybank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F.Supp. 957 (D.Mass.1991). Furthermore, where the contract language is ambiguous, evidence of trade usage is admissible to determine the meaning. *Affiliated FM Ins. Co. v. Constitution Reinsurance Corp.*, 416 Mass. 839, 626 N.E.2d 878, 881 (1994). The existence and scope of a usage of trade are questions of fact. *Id.* at 882. In the case at hand, Proteon has cited no case where a provision limiting liability for breach of contract has been applied other than for a breach of a warranty, where the aggrieved party still was left with minimum adequate remedies. PC COM has no remedy at all if it is denied consequential damages for its lost profits. This is not a case of defective goods, but one of nonperformance. No case known to this court has ever held that, as a matter of law (under Massachusetts law), a liability-limiting provision, typically applied in the context of warranty, precludes an award for consequential damages where the asserted breach of contract is nonperformance by the seller.

Therefore, neither of Proteon's contentions—that PC COM, and not Proteon, terminated and breached the Agreement and that, even if Proteon did breach, consequential damages are precluded by the terms of the Agreement—warrants granting Proteon's motion for summary judgment on PC COM's claim for breach of contract.

## II. Proteon's counterclaim for monies due under the Agreement

 Proteon seeks summary judgment on its counterclaim for monies due and owing in the amount of $347,867.37 for products ordered and delivered pursuant to the Agreement. PC COM withholds payment as a purported right to setoff against damages caused by Proteon's repudiation of the Agreement. We agree that PC COM is entitled to suspend its performance and potentially setoff its debts against its alleged damages. The common law right of setoff allows parties that owe mutual debts to each other to assert the amounts owed, subtract one from the other, and pay only the balance. *Darr v. Muratore*, 8 F.3d 854, 860 (1st Cir. 1993) (citing *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 896 F.2d 54, 57 (3d Cir.1990)). Under Massachusetts law, when a party repudiates a contract with respect to

a performance not yet due, the aggrieved party may "resort to any remedy for breach" and may "suspend [its] own performance". M.G.L.A. 106 § 2–610(b), (c) (1990). Furthermore, where the seller repudiates or fails to make delivery, the buyer may recover damages for non-delivery. M.G.L.A. 106 § 2–711 (1990). Finally, the buyer, upon notification, "may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." M.G.L.A. 106 § 2–717 (1990). *See also United California Bank v. Eastern Mountain Sports, Inc.*, 546 F.Supp. 945 (D.Mass.1982) (treat entire running account of invoices as a single contract and allow offset claims arising out of sales evidenced by particular invoices—including invoices already paid—against accounts claimed by seller on other outstanding invoices), *aff'd*, 705 F.2d 439 (1st Cir.1983).

Proteon's principal argument is that PC COM is not entitled to setoff against the $347,867.37 due because PC COM does not have a claim upon which relief can be granted. However, we deny Proteon's motion for summary judgment seeking dismissal of PC COM's claim. Therefore, we consider Proteon's other arguments for rejecting PC COM's claim for setoff—failure to provide notice, and preclusion by contract.

Proteon's claim that PC COM failed to satisfy the notice requirement is unconvincing. The letters exchanged at the end of June 1994 should have put Proteon on notice that PC COM was withholding payment due to Proteon's alleged nonperformance.[8] No formality of notice is required and any language which reasonably indicates the buyer's reason for holding up payment is sufficient. M.G.L.A. 106 § 2–717 cmt. 2 (1990).

Finally, Proteon urges that a provision in the Agreement requires PC COM to pay for orders already delivered and received, even if the Agreement is terminated. However, PC COM's liability for unpaid shipments is not the issue here. The issue is whether or not PC COM is entitled to setoff the amount against damages allegedly owed for breach of contract. For the reasons discussed above, PC COM is entitled to withhold payment to offset the amount owed against its alleged damages.

### III. Dutzy's motion to dismiss for lack of in personam jurisdiction

 Dutzy seeks dismissal of the case as to him on the ground that this court lacks in personam jurisdiction over him. FED. R.CIV.PROC. 12(b)(2). In diversity jurisdiction, the law of the state in which the district court sits governs personal jurisdiction over a nonresident defendant. *National Cathode Corp. v. Mexus Co.*, 855 F.Supp. 644, 647 (S.D.N.Y.1994); *Glass v. Harris*, 687 F.Supp. 906, 908 (S.D.N.Y.1988). The relevant New York jurisdictional statute, N.Y.Civ.Prac.L. & R. 302(a) (McKinney 1990), provides in pertinent part:

[A] court may exercise personal jurisdiction over any non-domiciliary ... who ...

3. commits a tortious act without the state causing injury to person or property within the state ... if he ...

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce....

For personal jurisdiction to attach pursuant to section 302(a)(3)(ii), plaintiff must establish that: (1) the defendant committed a tort outside the state; (2) the act caused an injury within the state; (3) the defendant expected or should reasonably have expected the act to have consequences within the state; and (4) the defendant derives substantial revenue from interstate or international commerce.

 The burden of establishing jurisdiction over a defendant is on the plaintiff. *See Rios v. Marshall*, 530 F.Supp. 351, 367

---

8. As a result of the pricing dispute, Friedman wrote to Dutzy, in a letter dated June 25, 1994:
 [I]t is clear ... from our conversation on June 16, 1994 that you do not wish to continue a business relationship with PC COM.... I understand that for whatever reason, your goal is to eliminate PC COM as a Proteon customer.

I'd like to propose the following scenario whereby you will get what you want....
I've intentionally withhold current payments due until resolution of these issues has been attained.
Ex. F.

(S.D.N.Y.1981). However, the plaintiff must make merely a *prima facie* showing that jurisdiction exists, despite contrary allegations by the moving party. *See A.I. Trade Finance, Inc. v. Petra Bank,* 989 F.2d 76, 79 (2d Cir.1993); *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990); *National Cathode,* 855 F.Supp. at 646; *Rolls–Royce Motors, Inc. v. Charles Schmitt & Co.,* 657 F.Supp. 1040, 1043 (S.D.N.Y.1987). Given that no evidentiary hearing has been held, plaintiff need not, at this point, prove jurisdiction by a preponderance of the evidence. *See Visual Sciences, Inc. v. Integrated Communications Inc.,* 660 F.2d 56, 58 (2d Cir.1981) ("In absence of a full-blown hearing on the merits, plaintiff need make only a prima facie showing that the court has jurisdiction under a long-arm statute." (citing *United States v. Montreal Trust Co.,* 358 F.2d 239, 242 (2d Cir.), *cert. denied,* 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 *reh'g denied,* 384 U.S. 982, 86 S.Ct. 1858, 16 L.Ed.2d 693 (1966))). Such a showing will not prevent the defendant from challenging the jurisdictional facts on the trial, and the plaintiff must then prove the facts supporting jurisdiction by a preponderance of the evidence. *Montreal Trust,* 358 F.2d at 242 n. 4; *Visual Sciences,* 660 F.2d at 58. The court is to construe all pleadings and affidavits in the light most favorable to the plaintiff, and is to resolve any doubts in the plaintiff's favor. *A.I. Trade Finance,* 989 F.2d at 79. The applicable standard is whether facts "may exist" to satisfy the requirements of section 302(a)(3)(ii). *Rios,* 530 F.Supp. at 367 (citing *Fantis Foods, Inc. v. Standard Importing Co.,* 49 N.Y.2d 317, 402 N.E.2d 122, 124, 425 N.Y.S.2d 783, 786 (1980)).

Resolving any doubts in the plaintiff's favor and construing all pleadings and affidavits in the light most favorable to the plaintiff, we find that the plaintiff has made a *prima facie* showing that jurisdiction exists. First, plaintiff alleges that Dutzy committed outside New York tortious acts of interference with its contract with Proteon. Second, plaintiff alleges that these acts caused substantial injury to it in New York through its loss of business. Third, plaintiff alleges that the defendant committed these tortious acts in the reasonable expectation that they would have consequences within New York state. Finally, plaintiff alleges that Dutzy individually derives substantial revenue from interstate commerce.[9] The statute does not require that a defendant must derive substantial revenue from interstate commerce directly as a result of tortious conduct, but only that the defendant derive substantial revenue from interstate or international commerce; the tortious act need not have anything to do with defendant's involvement in such revenue. 1 WEINSTEIN–KORN–MILLER, NEW YORK CIVIL PRACTICE ¶ 302.14 (1995).

Whether plaintiff can prove that Dutzy derives revenue from interstate commerce may depend upon his relationship to Proteon.[10] At this stage, prior to discovery, the nature of Dutzy's employment and source

---

**9.** In *Bulk Oil (USA) Inc. v. Sun Oil Trading Co.,* 584 F.Supp. 36 (S.D.N.Y.1983), the court held that it did not have jurisdiction over defendants (officers of a corporation) under N.Y.Civ.Prac.L & R. 302(a)(3)(iii) because, although the corporation received substantial revenue from interstate commerce, "plaintiff [had] not established that the individual defendants themselves 'derive substantial revenue from interstate or international commerce'...." 584 F.Supp. at 41–42. The case at hand is distinguishable because (1) plaintiff *has* alleged that defendant Dutzy himself derives, or stood to derive, substantial revenue from interstate commerce, *see Pl.'s Mem.,* p. 16 ("upon information and belief, Dutzy, himself derived substantial revenue from interstate commerce") and (2) plaintiff need not prove its allegations to a preponderance of the evidence at this stage, *see Visual Sciences, Inc. v. Integrated*

*Communications Inc.,* 660 F.2d 56, 58 (2d Cir. 1981).

**10.** *See Markham v. Gray,* 393 F.Supp. 163 (W.D.N.Y.1975):

["Interstate commerce"] must be defined by looking at the legislative history of the statute and also the construction given interstate commerce under federal antitrust law and New York statutes which are not entirely different from Section 302(a)(3)(ii). In proposing Section 302(a)(3)(ii), the Judicial Conference sought an amendment broad enough to protect New York residents and not so broad as to burden unfairly nonresidents whose connection with the state is remote. The requirement of substantial revenue from interstate commerce ... was intended to exclude non-domi-

of revenue is yet to be determined. A plaintiff opposing a motion to dismiss need only show that facts unavailable to him may exist, and need not demonstrate the actual existence of such facts. *See Rios,* 530 F.Supp. at 367. If PC COM carries its burden of proving each of the elements of section 302(a)(3)(ii) at trial, this court will have jurisdiction over Dutzy within the Constitutional limits of due process.

▮ Due process "requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus evoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

Defendants' reliance on the cases cited in their brief supporting their motion to dismiss as against Dutzy is misplaced. The cases cited by defendants consider jurisdiction under section 302(a)(1), which confers jurisdiction over a non-domiciliary who "transacts any business within the state or contracts anywhere to supply goods or services in the state...." Here, however jurisdiction is asserted under section 302(a)(3)(ii).

Accordingly, the motion by Dutzy to dismiss for lack of in personam jurisdiction is denied at this time with leave to renew after completion of discovery.

## CONCLUSION

For the foregoing reasons, we deny defendant Proteon's motion for summary judgment on PC COM's claim for breach of contract and on Proteon's counterclaim against PC COM for $347,867.37 for goods delivered, and we deny defendant Dutzy's motion to dismiss for.lack of in personam jurisdiction, with leave to renew upon completion of discovery.

SO ORDERED.

▮

---

ciliaries whose business operations are of a local nature.... The Judicial Conference suggested ... that while it might be possible, it would not be desirable, to exercise jurisdiction over a local Georgia retailer who sold a tire to a New York resident driving a vehicle bearing New York license plates, even thought the retailer may have had reason to foresee injury in New York if the tire was defective. On the other hand, the Conference said it might be fair and desirable to exercise jurisdiction over a defendant tire manufacturer engaged in interstate or international commerce, whether or not related to New York, the essential difference being that the latter is generally equipped to handle litigation away from his business location. Viewed in this light, the statute can be said to be directed towards those manufacturers engaged in substantial interstate activity who can expect and who are capable of defending suits in foreign forums and, therefore, [the defendant] was not within that class intended to be subject to long arm jurisdiction.... While ·the instant case is not within an antitrust context, a construction of interstate commerce under Section 302(a)(3)(ii) can be gleaned from the antitrust case law defining that term, which construction would be consistent with the legislative intent of New York's long arm statute. The practice of a profession such as medicine, or law, is predominantly a local operation. The fact that a surgeon lives on the border of his state and practices in two cities on either side of that border, does not alter the essentially local nature of his practice. Since the practice of a profession is predominantly local in character, interstate commerce under Section 302(a)(3)(ii) should be construed to incorporate the profession-business dichotomy, at least to exclude a local physician who treats his patients in two bordering states. 393 F.Supp. at 166. Viewed in this light, it is arguable that Dutzy, even assuming that his status of employment with Proteon was that of an independent contractor, is beyond the reach of New York's long arm statute because his practice as an independent contractor was strictly local in nature. Furthermore, the revenues from interstate commerce derived by Proteon cannot be attributed to Dutzy. *See Lehigh Valley Indus., Inc. v. Birenbaum,* 389 F.Supp. 798, 805 (S.D.N.Y.) ("[Plaintiffs] are incorrect in reasoning that the revenue derived by [the corporation] is automatically attributable to its sole shareholder defendant.... Jurisdiction over [the corporation] and not over defendant as an individual could be obtained by demonstrating that [the corporation] received substantial revenues from interstate commerce."), *aff'd,* 527 F.2d 87 (2d Cir.1975).