**PC COM, INC., Plaintiff,**

v.

**PROTEON, INC. and Jack Dutzy, Defendants.**

**No. 94 Civ. 5537 (WCC).**

United States District Court, S.D. New York.

Nov. 15, 1996.

See also 906 F.Supp. 894.

Singer Netter Dowd & Berman, New York City, (Edward M. Berman, of counsel), for Plaintiff.

Boyar, Higgins & Suozzo, P.A., Morristown, NJ, (James J. Higgins, of counsel), and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA (Timothy J. Langella, of counsel), for Defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff PC Com, Inc. ("PC COM") has sued Defendant Proteon, Inc. ("Proteon") for breach of contract and Defendant Jack Dutzy ("Dutzy") for tortious interference with contract. Proteon has counterclaimed for breach of contract and payment of $347,-867.37 allegedly due under the contract. PC COM has moved for partial summary judgment on the issue of liability; Proteon has moved for partial summary judgment on damages. This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

## BACKGROUND

For the sake of convenience, the summary of the facts and this Court's determination that Massachusetts law shall apply (as per the parties' choice of law provision), are reproduced from the earlier summary judgment ruling in this matter. *See PC COM v. Proteon, Inc.,* 906 F.Supp. 894 (S.D.N.Y. 1995).

Plaintiff PC COM is a Florida corporation maintaining a principal place of business in Elmsford, New York. Defendant Proteon is a Massachusetts corporation maintaining its principal place of business in Westborough, Massachusetts, and is duly qualified and licensed to do business in New York. Defendant Dutzy is an individual residing in New Hampshire employed by Proteon during all times relevant in this case.

Defendant Proteon has been in the business of manufacturing and selling electronic devices known as token ring adapter network interface cards ("NICs") and networking equipment, enabling the contemporaneous use by many computers of a central computer containing a central memory and programs (called a "file server"). This aggregation is known as a "network," and the network within a company is called a "local area network" ("LAN").

Proteon has sold LAN products through traditional channels, namely, through its own LAN Products Division sales personnel and sales offices. Traditional channel sales are principally to national distributors who, in turn, resell the products through intermediate dealers to ultimate consumers. Proteon also has had original equipment manufacturer ("OEM") arrangements with other companies to whom Proteon sells its LAN products bearing the Proteon trade name and logo for use, as well as for resale.

While at a computer trade show in November 1992, Proteon's then Director of OEM Sales, Robert Otten, approached PC COM to inquire whether PC COM was interested in becoming an OEM purchaser and reseller of Proteon products. Thereafter, Proteon and PC COM entered into an OEM Purchase Agreement, dated March 17, 1993 (the "Agreement"), for the purchase and sale of Proteon products to PC COM.

The parties operated amicably under the first year of the Agreement, which ended March 15, 1994. Both parties realized profit from the relationship, and no major disputes are on record.[1] Early in the second year, however, a disagreement arose regarding pricing. PC COM alleges that, on June 16, 1994, one of Proteon's sales support personnel telephoned PC COM to advise that defendant Dutzy, then Director of LAN Product Sales, had placed a "pricing hold" on PC COM orders.[2]

1. There is a dispute in this case as to whether or not PC COM fulfilled certain minimum purchase requirements and complied with labeling requirements during the first year, but these claims arose during the second year of the Agreement at approximately the time this action commenced.

2. Dutzy had been an employee of Proteon until some time in 1992. He became involved with

On June 17, 1994, Lisa Huber, a Proteon sales support person, sent a memo by fax to PC COM advising that Proteon would not honor an order received from PC COM due to the pricing dispute. Specifically, the memo indicated that Proteon would not honor the purchase order unless PC COM agreed to pay $432.25 per ISA NIC instead of the "agreed upon price" of $215.00 per card,[3] which had been the price paid during the first year of the Agreement.[4] As a result of this pricing dispute, PC COM withheld payments on several orders already received, with the first of these payments becoming due on June 20, 1994, pursuant to a 30–day credit arrangement. PC COM claims that Proteon's actions on June 16–17, 1994 constituted a breach and termination of the Agreement, thus warranting discontinued performance (i.e., payment) by PC COM. Proteon denies that its actions constituted a breach, and counters that PC COM's refusal to pay for the past orders already received and overdue (as of June 20, 1994) constituted a breach of the Agreement. Proteon and PC COM exchanged numerous letters attempting to resolve their differences, all to no avail.

On July 5, 1994, PC COM filed its complaint in the Supreme Court for the State of New York, Westchester County. PC COM sought compensatory damages of no less that $5 million from Proteon for its alleged breach of the Agreement and compensatory damages of no less than $5 million and punitive

damages in the sum of $500,000 from Dutzy for his alleged intentional interference with PC COM's contractual advantages.

Since the dispute, PC COM was able to link up with a competitor of Proteon, namely Olicom Corp. ("Olicom"), a Danish manufacturer of LAN products similar to those manufactured by Proteon. On July 11, 1994, Friedman wrote a memorandum addressed to PC COM's existing customers "to coax them to continue to do business with PC COM, and to now buy Olicom manufactured token ring adapter products instead of Proteon manufactured products." *Friedman Aff.*, p. 18, ¶ 56. The letter reads:

> As you may know, PC COM does not manufacture its Token Ring products. We have relied on Proteon to provide us with industry leading products. Our value added includes an overwhelming commitment to Unparalleled Customers Support . . . of its products that carry the PC COM name. The recent chaos at Proteon has impacted our ability to provide these functions at the high level we insist on. . . . In light of these daunting facts, *I have elected to terminate PC COM's OEM agreement with Proteon.* Quite frankly, I cannot in good conscious [sic] continue to recommend products manufactured by this company nor can I ask our salespeople to. I am concerned that Proteon's woes would reflect poorly on PC COM. . . . That is why, we've negotiated and signed an OEM agreement with Olicom to provide the in-

---

Proteon again when he received an offer of "contract assignment" with Proteon on May 11, 1994, which he accepted on May 12, 1994.

**3.** PC COM claims that Proteon agreed to a price of $215.00 per card for the duration of the Agreement:

> In June 1993, Otten phoned [Friedman] to urge that [PC COM] purchase additional ISA NICs to bolster Proteon's sales for its quarter ending June 30th [1993]. It was during that conversation when it was agreed that the price per ISA NIC was then lowered to $215.00, and that that was to remain the maximum per ISA NIC price from then on. And so it was. We thereby changed in practice the price for such NICs set forth on Schedule A to the Agreement. While that was the maximum price, Proteon charged PC COM the still lower price of $195.00 per ISA NIC on a number of special orders.

*Friedman Aff.*, p. 7, ¶ 18. Proteon denies that the $215.00 per card price was to apply to the second year.

**4.** The memo read as follows:

> DEAR STEVE, WE WISH TO THANK YOU FOR YOU PURCHASE ORDER NUMBER 61694A BUT REGRET TO INFORM YOU THAT UNTIL SUCH TIME AS A RESOLUTION IS MADE REGARDING PRICING, WE CANNOT HONOR YOU ORDER. IF YOU WOULD KINDLY REVISE YOUR ORDER USING A 35% DISCOUNT ($665.00 LIST—$432.25 NET) WE WILL BE HAPPY TO SHIP IT. IF YOU HAVE ANY QUESTIONS PLEASE FREE TO CALL JACK DUTZY, DIRECTOR OF SALES LAN PRODUCTS DIVISION AT 508–898–2800, EXT. 2213. THANK YOU. /s/ Lisa.

dustry's highest performing NIC card. Olicom's sentiments towards Customer Satisfaction reflect our own.... I now ask you to consider this same dilemma. It seems a perfect time to switch. All trends indicate you and your clients may be forced into such a decision soon anyway....

*Ex. F* (emphasis added). Proteon points to the underlined language as an admission that PC COM, and not Proteon, terminated the Agreement. PC COM describes this language as just "puffing" to customers and in no way an admission that it terminated the Agreement.

On July 29, 1994, Proteon and Dutzy removed the action from state court to the United States District Court for the Southern District of New York. On August 22, 1994, Proteon and Dutzy filed an answer to the complaint, denying liability to PC COM and raising several affirmative defenses. In addition, Proteon counterclaimed against PC COM for $347,867.37 due for products sold and shipped to PC COM between February 16 and June 29, 1994, and for damages arising out of PC COM's breach of the Agreement by selling other than private label products. PC COM filed a reply to the counterclaim denying that it breached the Agreement and asserting several defenses, including a right to set off its damages against the $347,867.37 allegedly due Proteon.

In April 1995, Proteon and Dutzy filed a motion seeking (1) summary judgment on PC COM's claim for breach of contract against Proteon, (2) summary judgment on Proteon's counterclaim against PC COM for unpaid charges of $347,867.37, and (3) dismissal of PC COM's claim for tortious interference with contract against Dutzy for lack of in personam jurisdiction. These motions were denied. In November 1996, plaintiff moved for partial summary judgment on liability against Proteon, and Defendant moved for partial summary judgment on damages.[5]

## DISCUSSION

Summary judgment is appropriate if "the pleadings, depositions, answers to interroga-

tories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(d). A court may grant summary judgment "only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact." *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990). On a motion for summary judgment, all evidence must be viewed and all inferences must be drawn in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 45 (2d Cir.1988).

■ Under New York choice of law principles applicable in this diversity action, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the contractual selection of governing law is generally determinative so long as the chosen state has sufficient contacts with the transaction, absent fraud or violation of public policy. *See CBS, Inc. v. Tucker,* 412 F.Supp. 1222, 1226 n. 5 (S.D.N.Y.1976). The Agreement provides that "[t]he validity, performance and all matters relating to the interpretation and effect of this agreement and any amendments hereto shall be governed by the laws of the State of Massachusetts." *Ex. A,* ¶ 20(f). The parties do not dispute that Massachusetts law should control. When a transaction bears a reasonable relation to this state and also to another state, the parties may agree that the law either of this state or of such other state shall govern their rights and duties. *N.Y.U.C.C.* § 1–105(1) (McKinney 1995); *Eastern Artificial Insemination Co-op. Inc. v. La Bare,* 210 A.D.2d 609, 619 N.Y.S.2d 858, 859 (1994); *Capital Nat'l Bank of New York v. McDonald's Corp.,* 625 F.Supp. 874, 879–80 (S.D.N.Y. 1986); *Associated Metals & Minerals Corp. v. Sharon Steel Corp.,* 590 F.Supp. 18, 20 (S.D.N.Y.), *aff'd,* 742 F.2d 1431 (2d Cir.1983). We see no reason to depart from the parties'

---

**5.** According to Defendant's September 31 letter, the parties have agreed to voluntarily dismiss Mr. Dutzy and are submitting an appropriate stipulation with respect thereto.

contractual choice of law. In the instant case, the matter in controversy has sufficient relation to Massachusetts. Therefore, Massachusetts law will control all matters relating to the interpretation and effect of the Agreement.

The gravamen of PC COM's claim is that Proteon breached the *modified* Agreement—or committed an anticipatory breach—by refusing to deliver on purchase orders unless PC COM agreed to pay a unilaterally increased price. Proteon offers two principal arguments for denying partial summary judgment to PC COM on the issue of liability. First, Proteon asserts that the Agreement was not modified, and even if it was, such modification was not permanent. Second, even if the Agreement was modified, Proteon did not breach the modified Agreement but rather it was PC COM itself that was in breach of, and then terminated, the Agreement. In its motion for partial summary judgment on damages, Proteon argues that, even assuming, *arguendo*, that it did breach the Agreement, provisions in the Agreement preclude claims for consequential damages, thus warranting summary judgment. PC COM argues that these provisions should not be enforced because Proteon has breached the Agreement in bad faith. We discuss each argument below.

## I. PC COM's Motion for Partial Summary Judgment against Proteon on the Issue of Liability

PC COM alleges that Proteon's June 16–17 refusal to accept its orders constituted a "violation of its duty of performing the agreement in good faith" and thus a repudiation of the Agreement.[6] Whether or not this is

correct depends, in the first instance, on whether the Agreement was modified as to price. Relying primarily upon common law cases, we previously denied summary judgment to Proteon on the issue of liability, finding that when the evidence is taken in a light favorable to PC COM, or even a neutral light, it supports the inference that the Agreement was orally modified. *PC COM,* 906 F.Supp. at 900. Since this is essentially a contract for the sale of goods, however, it is governed by Massachusetts' version of the U.C.C., M.G.L.A. 106 § 2–201 *et. seq.*[7] Thus, the relevant issue for this motion is whether, as a matter of law, these facts, when taken in the light most favorable to *Proteon,* still support the conclusion the Agreement was orally modified. In order to find a valid modification, we must find as a matter of law that the clause in the Agreement requiring waivers and modifications to be in writing should not be strictly enforced, or that Proteon has waived its right to rely upon the clause. If we find a valid modification we must still find, as a matter of law, that Proteon breached this modified agreement.

### Oral Modification

■ Under the U.C.C. parties can generally change a contract by a modifying agreement, by a course of performance, or by estoppel, 1 WHITE AND SUMMERS, § 1–6, p. 36. Proteon argues, however, that the Agreement was not validly modified, since ¶ 23 provides that "[n]o modification, amendment, recision, waiver, or other change shall be binding upon Buyer or Proteon unless and until made in writing and signed by authorized representatives of Buyer and Proteon,"

---

6. As part of Massachusetts' adaptation of the U.C.C., M.G.L.A. 106 § 1–203 imposes an obligation of good faith in the performance of every contract within the purview of chapter 106.

7. Plaintiff does not address the applicability or construction of the U.C.C. at all in its papers. At best, the Agreement would be considered a "hybrid" contract, since it involves the sale of the NICs (goods) as well as PC COM's obligation to provide customer support for the product (services). When faced with this situation, a minority of courts apply Article 2 only to the sale of goods aspects of the transaction, whereas a majority apply Article 2 only if the "predominant

purpose" of the whole transaction was a sale of goods, and in that event, the majority applies Article 2 to the whole. 1 WHITE AND SUMMERS, UNIFORM COMMERCIAL CODE, 4th Ed. § 1–1 p. 4 (citations omitted). *See Desimone v. Sullivan,* 1994 WL 772715 (Mass.) (Consistent with the majority rule, a contract for the development and sale of computer software is a contract for the sale of goods under the U.C.C.). Since this dispute involves the goods aspect of the contract, and the sale of goods is the predominant purpose of the Agreement, under either test, this case is governed by Massachusetts' adaptation of the U.C.C.

and there was no such writing.[8] These clauses are generally respected under the U.C.C., for under M.G.L.A. 106 § 2–209(2), "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded."[9] *See also* WHITE AND SUMMERS, § 1–6, p. 41–42 ("Remember the parties may ... provide that 'no waiver * * * shall bind * * * unless in writing.' This clause itself may be waived, but courts should be slow to find waiver of anti-waiver provisions. When parties agree in writing that no waiver or modification shall be binding unless in writing, the one seeking a modification should get it in writing.").

Here, we have no clear writing that would satisfy the requirements of ¶ 23. PC COM merely alleges "from the outset" Proteon and PC COM changed the Agreement pricing structure and fixed $235 as the per "ISA NIC OEM price." *See Pl. Brief, relying mainly on Pl. Exh. D* (a PC COM chart of sales from Proteon from December of 1992 to June of 1994 (the prices are consistent with Plaintiff's alleged "changed prices")); *Friedman Reply Aff.*, ¶ 2(D)(b).[10] Then, PC COM states: "Proteon and PC COM changed the Agreement Pricing Structure again when they fixed $228" as the per unit price starting with the order of March 26, 1993. Lastly, PC COM asserts that in a phone conversation between Friedman and Otten in June of 1993 "it was agreed that the price per ISA NIC was then lowered to $215, and that was to remain the maximum per ISA NIC price from then on." *Friedman Aff.*, p 7, ¶ 18. Nowhere does PC COM point to a writing passed between the parties memorializing this agreement. It is quite likely that there were purchase orders memorializing the fact of the "changed prices," but PC COM has not provided this Court with them.[11]

Though none of Plaintiff's cases were decided under the U.C.C., it cites several for the proposition that contracts can be orally modified, even if the specific language of the contract precludes such modification. *See, e.g., Cambridgeport Sav. Bank v. Boersner,*

---

8. Although neither party has raised the statute of frauds in this context, in addition to the explicit clause preventing a writing, there may be a statute of frauds problem under M.G.L.A. 106 § 2–209(3) ("The requirements of the statute of frauds section of the Article (Section 2–201) must be satisfied if the contract as modified is within its provisions"). As discussed below, Plaintiff has provided no writing which clearly satisfies the statute.

9. M.G.L.A. 106 § 2–209 also provides, in relevant part, that:

(2) [*see supra*] ...
(3) The requirements of the statute of frauds section of this Article (Section 2–201) must be satisfied if the contract as modified is within its provisions.
(4) Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.
(5) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

10. This is the entire reply submitted by PC COM.

11. Even if there were purchase orders, their ability to modify the Agreement is not certain. Nei-

ther party has addressed whether a purchase order is a sufficient writing, and ¶ 18 of the Agreement provides:

The terms and conditions of any present or future purchase order or other document submitted by Buyer which conflict with or in any way purport [sic] amend any of the terms and conditions of the agreement are specifically objected to by Proteon and shall be of no force of effect, nor shall govern in any way the subject matter hereof, unless the same refers to this agreement and is specifically agreed to in writing signed by an authorized representative of Proteon.

According to PC COM, its *Exh. D* ("Detailed Schedule of Orders placed by PC COM with Proteon for LAN Products"), is essentially a graphical summation it generated of the purchase orders. An offering into evidence of the orders themselves might arguably be sufficient to overcome the statute of frauds problem. *See C.I.F. Productions, Inc. v. Burlington Coat Factory Corp.*, 881 F.Supp. 104, 106 (S.D.N.Y.1995) (purchase orders sufficient since under U.C.C. § 2–201(2) (statute of frauds) retention without objection of a confirmatory writing satisfies the statute of frauds); *but see, e.g. Marlowe v. Argentine Naval Comm'n*, 808 F.2d 120, 123 (D.C.Cir. 1986) (where writings did not purport to modify the contract and would only do so by indirect implication, they did not support a waiver of the clause.) Proteon does not dispute, however, the fact that it sold NICs to PC COM at discount rates throughout 1993 and into 1994.

413 Mass. 432, 597 N.E.2d 1017 (1992) (mortgage note); *First Pa. Mortgage Trust v. Dorchester Sav. Bank,* 395 Mass. 614, 481 N.E.2d 1132 (1992) (share purchase agreement).

While it appears neither the Massachusetts Supreme Court nor the First Circuit construing Massachusetts law has considered the effects of a contractual clause requiring a writing on an attempted oral modification in light of § 2–209(2), the First Circuit has considered the issue, by analogy, under New Hampshire law. *Whitney Bros. Co. v. Sprafkin,* 3 F.3d 530, 533–34 (1st Cir.1993). There plaintiff entered a into a buy/sell agreement for stock, which included a clause providing that "this agreement may be altered, amended or terminated by a writing signed [by the parties]." *Id.* at 533, n. 4. Plaintiff alleged that after defendant received a letter from his attorney advising him to allow plaintiff to prepay, defendant orally agreed to do so. The First Circuit found that the lower court had erred in finding the asserted oral agreement binding in light of the clause prohibiting oral modification. *Id.* at 533. ("We construe plaintiff's failure to argue that the article does not prohibit oral alteration as a concession that it does.") It noted that the purpose of § 2–209 was to "protect against false allegations of modifications." *Id.* at n. 5, quoting § 2–209, comment 3.

Proteon urges that the New York federal courts similarly enforce these clauses.[12] *See, e.g. Stinnes Interoil, Inc. v. Apex Oil Co.,* 604 F.Supp. 978, 982 (S.D.N.Y.1985) (clause requiring express written agreement is binding against allegation that conduct of defendant amounted to modification, but conduct may serve as waiver); *C.I.F.,* 881 F.Supp. at 106 (S.D.N.Y.1995) (pursuant to New York § 2–

209, "the modification alleged here is unenforceable absent a writing sufficient to satisfy the statute of frauds");[13] *Cliffstar Corp. v. Riverbend Products, Inc.,* 750 F.Supp. 81, 88 (W.D.N.Y.1990) ("no agreement was reached *in writing* between the parties," as required by the contract and U.C.C. § 2–209(3), but genuine issue of fact existed as to whether rights were waived) (emphasis in original).[14]

Plaintiff has not cited and we have not found U.C.C. cases entirely disregarding explicit clauses requiring a modification be made in writing. *But see, In re Upchurch's Estate,* 466 S.W.2d 886 (Tenn.App.1970) (Letter apparently signed by deceased defendant purporting to make itself "part of our contract" was sufficient to satisfy a clause requiring any modifications be in writing and signed by both parties, even though widow challenged the deceased's signature and letter was not signed by other party). Several other courts have held the clause waived or a party estopped to assert it. *See C.I.T. Corp. v. Jonnet,* 1965 WL 8370 (Pa.Com.Pl.1965) (party benefiting from the clause could waive it if he specifically acted in reference to it), *aff'd,* 419 Pa. 435, 214 A.2d 620 (1965).

Although PC COM does not explain how it would avoid the strict language of § 2–209(2) enforcing clauses requiring modifications be written, M.G.L.A. 106 § 2–209(4) offers some guidance. It provides: "Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver." Thus, in light of the specific language of the contract requiring modifications to be in writing, and the provisions of § 2–209, we find that the Agreement could not be modified orally, un-

---

**12.** New York and Massachusetts appear to have adopted essentially identical versions of the U.C.C. (at least in the particular sections relevant to this case). While New York's interpretation of its version is not controlling, it is certainly persuasive. *See Matter of Barney Schogel,* 12 B.R. 697, 701 (Bankr.S.D.N.Y.1981).

**13.** Although the court found the Purchase Orders sufficient, it did not find they established a modification as a matter of law.

**14.** Defendant also asserts that "a host of other jurisdictions" follow the strict language of the

U.C.C. *For the Circuit courts he cites, see, e.g., Marlowe v. Argentine Naval Comm'n,* 808 F.2d 120, 123 (D.C.Cir.1986) (oral agreement to modify the permissible time of delivery of two airplanes was invalid in light of the contract's express provision prohibiting such action); *Wisconsin Knife Works v. Nat'l Metal Crafters,* 781 F.2d 1280, 1285 (7th Cir.1986). *But see Double–E Sportswear Corp. v. Girard Trust Bank,* 488 F.2d 292, 298 (3rd Cir.1973) (question of fact whether requirement of a writing was waived resulting in an effective oral modification).

less Proteon, by its conduct, waived its right to rely on the clause.

Lending some structure to PC COM's rather vague argument, Proteon addresses the doctrine of waiver by course of performance in its response, providing several arguments against finding a waiver that are quite compelling.

First, Proteon points to the specific language of ¶ 23 of the Agreement, *supra*, which excludes not only modification, but waiver as well, unless it is in writing. Along the same vein, ¶ 20 states that "any course of dealing or trade usage not contained or referenced herein will not be binding." *See* M.G.L.A. 106 § 2–208(2);[15] *Marlowe*, 808 F.2d at 123 (D.C.Cir.1986) (oral agreement could not serve as waiver since contract specifically precluded any oral waiver).

Second, Defendant urges that the question of whether a waiver occurred is inappropriate for resolution on summary judgment because it involves determination of whether a party "intentionally waived a known right," and such determination presents a genuine issue of material fact. *See Spinnerin Yarn Co., Inc. v. Apparel Retail Corp.*, 614 F.Supp. 1174, 1180 (S.D.N.Y.1985) ("The issue of whether the parties' course of performance worked a waiver of one or more terms in their contract is a question for the fact finder. . . . The U.C.C. waiver provisions are essentially 'equitable' in nature.") (citations omitted); *Albany Roller Mills, Inc., v. Northern United Feeds and Seeds, Inc.*, 397 N.W.2d 430, 432–33 (Minn.App.1986).

Third, Defendant urges that assuming his conduct in acquiescing to sales at lower prices for over a year was found to be a valid waiver of the right to a written modification, there are also material issues of fact as to how long such modification was intended to last and whether such waiver was retracted by the June 16 phone call instituting a pricing hold and the June 17 fax requesting increased payment. Paragraph 20(d) of the Agreement provides that "any waiver of any breach of this agreement shall be limited to the particular instance and shall not operate or be deemed to waive any future breach of it, nor shall any delay on the part of any party to act upon any breach be deemed a waiver thereof."[16]

This clause is consistent with § 2–209(5), which provides:

A party who has made waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required unless the retraction would be unjust in view of a material change of position in reliance upon the waiver.

M.G.L.A. 106 § 2–209(5). Thus, there are fact issues as to whether the June communications were "reasonable notification," as well as to whether such notification was "unjust" in view of a material change by PC COM reliance upon the waiver. PC COM has presented no evidence, other than the allegation that it ordered more in response to reduced prices, to suggest it materially changed its position. Further, PC COM needs to establish, in the face of its apparent ability to cover with Olicom products, that Proteon's withdrawal of its waiver worked an injustice.

Thus, even if PC COM is successful in avoiding the specific provisions of ¶ 23 and the statute of frauds, and may readily be able to provide purchase orders to support its argument that the clauses and the statute were waived, these successes do not establish that a lasting *modification* was made. *See C.I.F.*, 881 F.Supp. at 106–7. As comment 3 to § 2–201 (statute of frauds) states, "The

---

15. M.G.L.A. § 2–208(2) provides: "The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control use of trade."

16. PC COM points out, however, that Proteon honored orders at discount prices as late as May 14, bringing into question exactly how long Proteon intended to allow the waiver. *Friedman Reply Aff.*, ¶ 2(B)(iv), p. 3. (Proteon states that it was entitled to the higher prices in the second year because PC COM had not met the volume quotas necessary to maintain the discount) (*see infra*).

burden of persuading the trier of fact that a [modification] was in fact made orally prior to the written confirmation is unaffected." *Id.* In *C.I.F.*, the court found even though Plaintiff had successfully avoided the statute, there remained "a genuine issue of fact as to whether a modification was made." *Id; See also Albany Roller Mills,* 397 N.W.2d at 433 (question of fact whether party waived no oral modification clause). In light of the explicit language of the contract preventing oral modification or waiver without a writing, the statute of frauds, PC COM's failure to produce a writing that clearly satisfies these requirements, the equitable nature of the doctrine of waiver, the possibility that the June communications effectively terminated any waiver, and PC COM's failure to show either a material change of position or that Proteon's withdrawal of the waiver caused an injustice, we cannot find, as a matter of law, that the Agreement was validly modified.

### Proteon's Alleged Breach

■ Since we are unable to find, as a matter of law, that the contract was modified, we do not need to reach the issue of whether Proteon or PC COM was in breach of any such modified agreement. However, we have examined the parties' briefs on this issue, and we note that in addition to the issues of fact surrounding the alleged modification, there do appear to be several outstanding issues of fact as to whether PC COM was in compliance with the Agreement at the time it alleges Proteon breached. If the fact finder should find that PC COM was not in compliance, it will then have to determine whether such non-compliance "substantially impaired the value of the contract", thus constituting an anticipatory repudiation of the contract and giving Proteon grounds to refuse further performance. *See* M.G.L.A. 106 § 2–610.

For example, there is a fact dispute as to whether PC COM met the minimum volumes

to remain an OEM Purchaser at all. The Agreement (¶ 7) provides if PC COM "purchases" did not exceed 4,400 units from March 15, 1993, to March 15, 1994, Proteon was entitled to terminate the Agreement. By counting two shipments made before the agreement (totaling 130) and a shipment ordered before but delivered after (400), PC COM asserts it was in compliance. Defendant alleges it is "undisputed" that PC COM was obligated to order and have delivered the NICs during the time period, citing the language of the Agreement and Friedman's deposition testimony. *Def. 3(g) stmt.,* ¶ 23. However, the source of defendant's certainty is not apparent from either the Agreement or Mr. Friedman's Deposition. We believe there is a fact issue as to whether the parties intended by providing in ¶ 5 a "minimum *shipment* schedule" and in ¶ 7 a "Minimum Annual Unit Volume Level of 4,400 NIC *purchases*" to require that PC COM have *received* the NICs to be in compliance.[17] (emphasis added).

Likewise there is also a fact dispute as to whether PC COM was entitled to the discount pricing after March 15, 1994. According to ¶¶ 5 and 8 of Schedule A to the Agreement, PC COM had to meet in each quarter of 1993 minimum quantity levels of 600, 1,500, 1,550 and 1630, respectively. Instead, according to Proteon, PC COM "ordered and shipped" only 345, 505, 1,550 and 1,630 NICs and was thus not entitled to discount pricing.

Lastly, Proteon alleges that PC COM was itself in breach of the Agreement. First, for selling NICs using Proteon's label in violation of the private labeling requirements of the Agreement, thus interfering with Proteon brand sales channels. (In effect, Proteon alleges PC COM was selling to Proteon's resellers at prices far below what they normally paid Proteon distributors). (PC COM again alleges this requirement was orally

**17.** These disputes may be legal as well as factual. Defendant has a compelling argument that any evidence of an earlier agreement to allow PC COM's precontractual sales to count towards its minimum volume requirements is barred by the parol evidence rule. *See* M.G.L.A. 106 § 2–202 ("[t]erms which are ... set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms ... may not be contradicted by evidence of any prior

agreement or of a contemporaneous oral agreement.") Paragraph 23 clearly provides that "the foregoing and attached Schedules represent the entire agreement of the parties with respect to the matter hereof," and Schedule A states that "Minimum Annual Unit Volumes" are to be based upon shipments "beginning" or "following" March 15, 1993. Thus, since these earlier agreements contradict the fully integrated writing, they are inadmissible.

waived, but Proteon's employees dispute the factual contentions that would support such a waiver). Second, Proteon claims PC COM was in breach for not providing written business plans (Proteon claims this requirement was orally waived) or rolling sales forecasts that were to be updated each month. (PC COM here points out that ¶ 22 of the Agreement contained a 20–day notice and cure provision that Proteon disregarded.) As this brief overview clearly shows, whether or not PC COM's actual submissions to Proteon and/or the parties' "oral modifications" regarding these matters served to satisfy these requirements and thus relieve PC COM of being in breach, are also issues of fact. (So are numerous other disputes not mentioned here that become apparent upon careful reading of the parties' submissions). Such fact issues are inappropriate for resolution on summary judgment.

In view of our inability to find that the Agreement has been modified, and the numerous fact issues that remain to be resolved, PC COM's motion for partial summary judgment on the issue of liability is denied.

## II. Proteon's Motion for Partial Summary Judgment on the Issue of Damages

■ Proteon has moved for partial summary judgment on the issue of damages,

urging this court that even assuming, *arguendo*, it breached a modified version of the Agreement,[18] there can be no consequential damages because they are excluded by ¶ 12 of the contract.[19] According to the U.C.C., consequential damages resulting from a seller's breach include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." M.G.L.A. 106 § 2–715(2)(a). In essence, consequential damages are economic loss, such as lost profits. *See Canal Elec. Co. v. Westinghouse Elec. Corp.*, 756 F.Supp. 620, 627 (D.Mass.1990), *aff'd in part, rev'd in part*, 973 F.2d 988 (2d Cir.1992); *Nyquist v. Randall*, 819 F.2d 1014, 1017 (11th Cir.1987).

Limitations on liability (as well as remedies) are permitted under U.C.C. § 2–719.[20] We previously denied summary judgment to Proteon on this ground, noting that none of the cases it cited were on point because they involved breaches of warranty, and that if we granted the motion PC COM's remedy would fail of its essential purpose. *PC COM v. Proteon*, 906 F.Supp. at 902. Proteon correctly asserts that in order to decide this motion the court must determine whether (1) whether a minimum adequate remedy ex-

18. For the purposes of this second motion, we must view the evidence in the light most favorable to *PC COM*, and assume that there was a valid oral modification of the agreement that had lowered the price below the $432.25 per unit demanded by Proteon on June 17.

19. Paragraph 12 of the Agreement, entitled "Limitation of Liability" provides in conspicuous capital letters:

IN NO EVENT SHALL PROTEON BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, OR FOR COMMERCIAL LOSSES FROM ANY CAUSE INCLUDING, BUT NOT LIMITED TO LOSS OF PROFIT OR REVENUES, WHETHER OR NOT PROTEON HAS RECEIVED NOTICE OF THE POSSIBILITY OR CERTAINTY OF SUCH DAMAGES OR LOSSES.

20. M.G.L.A. 106 § 2–719 (Contractual Modification or Limitation of Remedy) provides:

(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages
(a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the purchase price or to repair and replacement of non-conforming goods or parts; and
(b) resort to a remedy as to provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter.
(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconsciona-

ists [21] and (2) whether the limitation of consequential damages is unconscionable. *See* M.G.L.A. 106 § 2–719; *Canal Elec.*, 548 N.E.2d at 183–85. However, answering those two questions does not complete the analysis. Many courts impose an additional obligation of good faith under U.C.C. § 2–203 [22] upon parties seeking to rely upon favorable contract provisions before they can invoke such provisions to their benefit. We discuss each of these considerations in turn.[23]

### Minimum Adequate Remedy

■ The comments to Massachusetts § 2–719 provides that "[i]t is the very essence of a sales contract that at least minimum adequate remedies be available." Comment 1, M.G.L.A. 106 § 2–719.[24] Proteon urges that PC COM's ability to cover provides it such a "minimum adequate remedy." [25]

At least one court has found that where a contracting party retains the right to seek ordinary contract damages, despite a limitation on consequential damages, that party's ability to seek cover provides a minimum adequate remedy. *Chateaugay*, 162 B.R. at 961. In *Chateaugay*, the court upheld the damages limitation even though it recognized that the aggrieved party may not have suffered ordinary contract damages. *Id.* (involving late delivery under a contract that specifically limited the seller's liability for late delivery). *See also McDonnell Douglas*, 758 F.2d at 348 (where defendant failed to deliver airplane, the court found liability limitation was not unconscionable and without applying a "minimum adequate remedy" analysis).[26]

---

ble, but limitation of damages where the loss is commercial is not.

**21.** Proteon is correct in its assertion that the language of M.G.L.A. 106 § 2–719(2) prohibiting a limited remedy from "fail[ing] of its essential purpose" is not applicable here. As the *Canal* court explained, "The disclaimer of consequential damages is an entirely separate contractual provision from the limited repair or replacement remedy and thus survives the failure of the limited remedy." *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 406 Mass. 369, 548 N.E.2d 182, 186 (1990) (finding that damage limitation provided a "minimum adequate remedy"). *See also, McNally Wellman Co. v. New York Elec. and Gas Corp.*, 63 F.3d 1188, 1196 (2d Cir.1995) (construing New York's essentially identical adaptation of U.C.C. § 2–719); *In re Chateaugay*, 162 B.R. 949, 959 (Bankr.S.D.N.Y.1994) (New York law); *In re Feder Litho–Graphic Services, Inc.*, 40 B.R. 486, 489 (Bankr.E.D.Mi.1984) ("the Code ... tests each by a different standard. The former [a limited remedy clause] survives unless it fails of its essential purpose, while the latter [a provision excluding consequential damages] is valid unless it is unconscionable.")

**22.** M.G.L.A. 106 § 1–203 (Obligation of Good Faith) provides:

Every contract or duty within this chapter imposes an obligation of good faith on its performance or enforcement.

**23.** As a preliminary matter, Proteon has now brought to this Court's attention several cases in which a limitation of liability clause was upheld in contexts other than breach of warranty. *See, e.g., Standard Register v. Bolton–Emerson, Inc.*, 38 Mass.App.Ct. 545, 649 N.E.2d 791, 793 (1995) (while fraud damages may survive, damages due to breach of contract arising out of seller's non-delivery of hot-metal coater were barred by the liability limitation clause); *L.A.R. Serv. Ctr., Inc.*

*v. Whirlpool Corp.*, 896 F.Supp. 48, 52 (D.Mass. 1995) (enforcing clause in context of franchisor's breach of franchise agreement); *Boylston Housing Corp. v. O'Toole*, 321 Mass. 538, 74 N.E.2d 288, 302–4 (1947) (clause upheld to bar recovery of lost rents in context of delay in completion of elevator installation). *See also McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 348 (8th Cir.1985) (clause upheld in context of seller's failure to supply aircraft parts), *cert. denied*, 474 U.S. 948, 106 S.Ct. 347, 88 L.Ed.2d 294 (1985); *Three–Seventy Leasing Corp. v. Ampex Corp.*, 528 F.2d 993, 998 (5th Cir.1976) (clause upheld to preclude recovery of lost profits where seller failed to deliver computer parts); *Dow Corning Corp. v. Capitol Aviation, Inc.*, 411 F.2d 622, 626–27 (7th Cir.1969) (clause upheld where seller failed to deliver airplane).

**24.** Comment 1 goes on to provide that "any clause purporting to modify or limit the *remedial* provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this article are applicable as if the stricken clause had never existed." (emphasis added.) "Other remedies" available for non-delivery or repudiation include lost profits. M.G.L.A. 106 § 2–713 ("the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price, together with any incidental expenses saved in consequence of the seller's breach.")

The applicability of this comment to limitations on consequential damages is questionable, however, in view of *Canal, McNally Wellman and Chateaugay*, fn. 21, *supra*.

**25.** PC COM does not directly address this issue.

**26.** Proteon also cites *Frantz Lithographic Serv., Inc. v. Sun Chemical Corp.*, 1984 WL 178953

PC COM's ability to adequately cover is in dispute, however. Although in his deposition Friedman stated that from the end of June PC COM was able to purchase comparable performing NICs from Olicom at comparable or lower prices (*Def.Exh.B, Friedman Depo.* at pp. 57–58, 65–67, 165), PC COM states in its brief that its "customers rejected them and wanted only those manufactured by Proteon—there is significant brand loyalty in the computer industry." *Pl.Mem.Law in Opp. to Def.Motion for Partial Sum.Jdgmt, p. 17;* see also *Friedman Aff. in Opp. to Proteon's Motion,* ¶ 40C, p. 138.[27] While Defendant strenuously contests the reliability of this affidavit testimony,[28] we believe the issue of the credibility of the later statements is best left to the trier of fact.

Another fact intensive issue, the custom and practice in the industry regarding liability limitation clauses, may be relevant to the question of whether cover was an adequate remedy here. In *Canal,* (a case involving a

breach of warranty), in considering whether a limitation on liability survived where a limited remedy failed of its essential purpose, the Massachusetts Supreme Court considered the public policy of allowing parties to agree to consensual risk allocation, as well as the common practices of the industry. *Canal,* 548 N.E.2d at 185–186 (where seller had already refunded to buyer the entire purchase price, the limitation of consequential damages for breach of warranty left a minimum adequate remedy.)

Similarly, we previously found the Agreement's liability limiting clause to be ambiguous as to whether it was intended to apply in situations other than breach of warranty. We noted that in these situations where language is ambiguous as to the parties intent, summary judgment is precluded, and suggested that industry custom was relevant to determine the meaning of the language. *PC COM v. Proteon,* 906 F.Supp. 894, 903, citing *Seiden Assoc., Inc., v. ANC Holdings, Inc.,*

(E.D.Pa.1984) at *5–6. There, however, the court found that plaintiff lessee's right to receive the amount paid under the lease *plus* his ability to cover, whether or not exercised, served as a minimum adequate remedy. Numerous other cases are cited by Proteon regarding PC COM's ability to cover either involved a breach of warranty, or availability of another remedy in addition to cover. *See, e.g., Canal Electric,* 548 N.E.2d at 186 ("this [repayment of the purchase price] and any non-consequential damages under the Code is a 'minimum adequate remedy' "); *County Asphalt v. Lewis Welding and Eng'g Corp.,* 323 F.Supp. 1300, 1309 (S.D.N.Y.1970) (Where defendant had substantially performed and the contract provided for repair and replacement, excluding consequential damages did not prevent plaintiff from seeking ordinary damages flowing from the breach.), *aff'd,* 444 F.2d 372 (2d Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971); *Rubin v. Telemet Am., Inc.,* 698 F.Supp. 447, 449–50 (S.D.N.Y.1988) (in case involving delivery of defective pocket electronic device where the contract provided for one year free service and parts, the court noted "even if the prescribed remedy fails to compensate an aggrieved party adequately, consequential damages do not automatically become available when a valid contract excluded them.")

27. This affidavit contains numerous statements that are conclusions of law, not fact, and reads at least initially like a brief. (*See e.g.,* ¶ 4: "Proteon willfully and deliberately breached the implied covenant of good faith and fair dealing"; ¶ 8 "I understand that the same deliberate and willful acts committed by Proteon which we have com-

plained of and which we have discovered into may also constitute an unfair trade practice.") Perhaps the tenor of these affidavits explains why PC COM's briefing on these motions has been rather scanty—it seeks to rely upon affidavits as legal argument. The Court has attempted to do as Defendant requested and has not considered those portions of PC COM's affidavits that are not made with personal knowledge but are essentially legal argument.

28. In its *Reply,* Proteon has pointed out numerous instances where the deposition testimony of PC COM's witnesses differs from that contained in the affidavits it attaches to its briefs, and urges the court at one point to disregard these affidavits because "[t]he rule is well settled in this circuit that a party may not, in order to defeat a motion for summary judgment, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony". *Rosner v. Codata Corp.,* 917 F.Supp. 1009, 1019 (S.D.N.Y. 1996) ("The rule is necessary to insure that summary judgment functions properly because '[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as procedure for screening out sham issues of fact.' ") (citations omitted); *FDIC v. Betancourt,* 865 F.Supp. 1035, 1046 (S.D.N.Y.1994). While these assertions of Friedman regarding the sufficiency of Olicom's cover appear inconsistent and are thus suspect, they are not so blatant as to warrant disregarding of the affidavit.

959 F.2d 425, 428 (2d Cir.1992) ("In the past [the Second Circuit has] defined ambiguous language as that which is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.") As evidence of industry custom, Proteon points out that both PC COM and Proteon have agreed to these liability limiting clauses in the past. *For excerpts from contracts entered into by PC COM and Proteon, see Def.Exhs.* J, K, (PC COM) and L, M, N, O, P, Q, R (Proteon). While these exhibits are strong evidence of the parties' prior practices, they are not determinative, as a matter of law, of industry custom.

In view of the rather thin record of analogous cases finding that the ability to cover alone provides a minimum adequate remedy, and the issues of fact that exist regarding witness credibility and industry custom and practice, we cannot find, as a matter of law, that were we to enforce the liability limitations in the Agreement, PC COM would retain a minimum adequate remedy.

### Unconscionability

■ A court will declare a contract unconscionable in order to prevent oppression or unfair surprise. *Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.,* 767 F.Supp. 363, 374–75 (D.Mass.1991). The relevant consideration is the situation at the time the contract was made, and not the situation as it later developed. *Id.* The determination of whether a clause in a contract is unconscionable is a question of law for the court.

■ Here, plaintiff has made no real allegation that the clause was unconscionable, but relies instead on the assertion that Proteon is estopped to rely upon the clause due to its bad faith. Numerous cases have found that "the doctrine of unconscionability is not typically applied to commercial dealings between business entities." *Boston Helicopter,* 767 F.Supp. at 375; *Deerskin Trading Post, Inc. v. Spencer Press, Inc.,* 398 Mass. 118, 495 N.E.2d 303, 307–08 (1986); *Chateaugay,* 162 B.R. at 959–60. Since both parties are sophisticated business entities operating in a commercial context, and neither contests seriously this issue, we find the liability-limiting clause not to be unconscionable as a matter of law.

### Proteon's Bad Faith Breach

■ PC COM's only defense to Proteon's motion is that Proteon should not be permitted to rely on the limitation of liability provision of ¶ 12 since it has acted in bad faith by deliberately breaching the (modified) Agreement. *See* CORBIN ON CONTRACTS (1962) § 1472 ("It is not illegal for a party to a contract to limit his liability in damages for non-performance of his promises, although such provision is not effective in case he acts fraudulently or in bad faith."); *Northern Heel Corp. v. Compo Indus., Inc.,* 851 F.2d 456, 471 (1st Cir.1988) ("We do not doubt that a party's completely unwarranted departure from a 'done deal' would be a sufficient predicate for a showing of bad faith.") As evidence of Proteon's bad faith intention to destroy the Agreement, PC COM points to, among other things, a June 6 internal Proteon E-mail message stating "the contract is about the onoy [sic] only thing of substance we [Proteon] have against them other than a bunch of complaints from the field and customers." *Plaintiff's Exhibit Q to it Motion on Liability.* Proteon counters that as a matter of law, its conduct did not constitute bad faith.

PC COM has cited numerous non-Massachusetts and non-U.C.C. cases in support of its argument that contracts should be "construed in accordance with justice and common sense and the economic reason why the parties entered into the contract" and that in this vein, courts will deviate from specific provisions of contracts where the party seeking to rely on the contract has acted in bad faith. *See, e.g., Fortune v. Nat'l Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251, 1256 (1977) (termination in bad faith of employee under explicit employment at will contract constitutes breach of contract); *Kerrigan v. City of Boston,* 361 Mass. 24, 278 N.E.2d 387 (1972) (clause in collective bargaining agreement regarding payment into a fund for purposes of insurance of employees should be read "in a manner to give effect to the chief

design to be accomplished by the instrument").

Many of these cases are not particularly helpful in this context, since in situations where the U.C.C. would produce a different result from traditional common law, the U.C.C. displaces the common law. *McNally*, 63 F.3d at 1196. Thus, the critical issue is how limitation clauses are analyzed under the U.C.C. One or two cases cited by PC COM address this issue, and we will turn to these now.

For example, the District Court for the District of Columbia has noted that while D.C. courts had not decided the issue "most jurisdictions, including Maryland" have held that "a seller who acts in bad faith may not claim the benefit of a limitation of *remedy* that by itself would be valid." *Potomac Plaza Terraces, Inc. v. QSC Prod., Inc.* 868 F.Supp. 346, 352–53 (D.D.C.1994) (emphasis added), (quoting 5 Ronald A. Anderson, Uniform Commercial Code § 2–719:69 at 59 (3d ed., 1981) and *Dowty Communications v. Novatel Computer Sys. Corp.*, 817 F.Supp. 581, 590 (D.Md.1992), *aff'd sub nom, Cray Communications, Inc., v. Novatel Computer Sys., Inc.*, 33 F.3d 390 (4th Cir.1994)). However, Anderson goes on to state that *"the breach of the implied duty to exercise good faith does not render invalid or unconscionable a provision in the contract excluding lost profits as damages." Id.* (emphasis added), (citing *Phillips Mach. Co. v. Le-*

*Blond, Inc.*, 494 F.Supp. 318, 324 (N.D.Okla. 1980) ("... it is important to distinguish between unconscionability in formation of a contract and a subsequent breach of the good faith obligation. In determining whether a clause authorized by § 2–719(3) is enforceable, the test is whether the clause or contract is unconscionable at the time of contracting. Subsequent events will not make a valid provision unconscionable.")).

Proteon, has not seriously challenged the applicability of the good faith requirement in this context (instead it argues that as a matter of law, PC COM has not raised a genuine issue of material fact on this point).[29] We point out, however, that the Massachusetts Supreme Court has stated that (despite liability limiting clauses) "consequential damages are awarded in cases in which the facts show willful dilatoriness or repudiation of warranty obligations by the seller." *Canal,* 548 N.E.2d at 186 & n. 6 ("bad faith" is generally not the term used by courts).

While there is some question as to whether an analysis focusing on defendant's conduct leading up to its breach should be applied at all, and if so whether "bad faith" is the proper standard to apply, we also note that in many cases relied upon by Proteon itself, the court, after undertaking the "minimal adequate remedy" and the unconscionability analysis, considered whether the conduct complained of constituted bad faith.

---

**29.** For example, Proteon notes that many of the cases relied upon by PC COM involved acts of fraud or misrepresentation on the part of the party found to have acted in bad faith. *See, e.g., Cambridge Plating Co., Inc. v. NAPCO,* 876 F.Supp. 326, 337 (D.Mass.1995) (defendant acted in bad faith when it failed to reveal knowledge in its possession that would have lessened damages and when it claimed that it was plaintiff's employees that caused the system's problems and not the absence of a key part), *aff'd in part, vacated in part,* 85 F.3d 752 (1st Cir.1996); *Long Island Lighting Co. v. Transamerica Delaval, Inc.,* 646 F.Supp. 1442, 1449–50 (S.D.N.Y.1986) (plaintiff put forth sufficient evidence of defendant's concealment of the diesel defects to establish a genuine issue of fact as to bad faith.)
 Proteon cites instead several cases where no genuine issue of material fact was found as a matter of law. *See, e.g., McNally,* 63 F.3d at 1199, n. 9 (where defendant accused plaintiff of bad faith for, *inter alia,* not exercising a right

under the contract that the court found it was not entitled to exercise, he had failed to raise a material fact issue as to bad faith.); *AT & T v. New York City Human Resources Admin.,* 833 F.Supp. 962, 990 (S.D.N.Y.1993) (where complaint was devoid of allegations of fraud, willful misconduct or bad faith but merely alleged negligent actions by party allegedly in breach, it failed to raise a genuine issue of material fact as to bad faith); *Damin Aviation Corp. v. Sikorsky Aircraft,* 705 F.Supp. 170, 178 (S.D.N.Y.), *aff'd,* 880 F.2d 1318 (2d Cir.1989) (where claims of prior knowledge of defects were statements of plaintiff's own employees or of third parties made after the accident at issue, no genuine issue of material fact had been raised as to bad faith.) None of these cases cited by Proteon involved the level of the evidence of bad faith PC COM has presented here—a clear pattern of behavior inconsistent with the written Agreement terms and a problematic Proteon E-mail message.

For example, in *McNally*, after determining that the clause excluding consequential damages was enforceable, the Second Circuit considered whether the defendant's actions constituted bad faith. *McNally*, 63 F.3d at 1198 n. 9 (there is some support for the contention that bad faith is an exception to the enforceability of a consequential damages exclusion under § 2–719(3)). *See also County Asphalt*, 323 F.Supp. at 1308 ("Were the defendant guilty of bad faith, it might have been estopped to assert the exculpatory clause.")

Since Proteon has not seriously challenged the application of the good faith test, and cases it cites seem to employ it, we believe that it should be applied in this case. Even though Proteon has made compelling arguments distinguishing the cases relied upon by PC COM from this case, we believe that when the evidence is taken in the light most favorable to PC COM, there is a triable issue of fact as to whether Proteon acted in bad faith. We acknowledge that the row PC COM has to hoe is long and difficult (PC COM must show that the Proteon waived its right to rely on the Agreement clauses requiring a writing, that the Agreement was orally modified, that Proteon (and not PC COM) breached this Agreement, and that such breach was unjustified and in bad faith). However improbable it may be that PC COM will be able to establish all of these preliminary points, we cannot say as a matter of law that it is not possible, and in light of the June 6 Proteon E–mail message stating "the contract is about the onoy [sic] only thing of substance we [Proteon] have against them other than a bunch of complaints from the field and customers," we cannot say as a matter of law that Proteon did not knowingly and in bad faith terminate the Agreement. This question, like many others in this case, is heavily dependent on the determination of whether the Agreement was in fact modified, for only if it was modified can Proteon be found to be in (willful) breach.

It is important to note, however, that M.G.L.A. 106 § 2–715(2) states that consequential damages include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and *which could not reasonably be prevented by cover or otherwise.*" (emphasis added). Thus, even if PC COM can establish it is entitled to consequential damages, to the extent it has been able successfully to cover (it appears that PC COM has covered at least partially with the Olicom contract), it cannot recover for damages it did not suffer. As discussed above, there remains a fact issue as to whether and to what extent PC COM's cover was adequate.

Additionally, should the jury find either that the Agreement was not modified, that Proteon did not breach it, or that such breach was not made in bad faith, the damages PC COM claims under M.G.L.A. 93A (unfair trade practices) may also be barred. This turns on whether the 93A damages are essentially duplicative of the damages claimed for breach of contract, or if they arise from separate actions of defendant, such as acts of fraud. *See, e.g. Boston Helicopter*, 767 F.Supp. at 377 (in some circumstances, 93A may be a duplicative claim, and therefore, a clause excluding consequential damages can also bar a 93A claim); *Canal*, 548 N.E.2d at 187–88; *Standard Register*, 649 N.E.2d at 793 (where plaintiff alleged entirely separate damages under 93A of fraud due to defendant's continued representations that he would provide the coater, the 93A claims were not barred). For the purposes of this motion, this court has not considered the 93A claim and we thus do not rule on whether the damages would be separate or duplicative.

### Conclusion

Both PC COM's motion for partial summary judgment on the issue of liability and Proteon's motion for partial summary judgment on the issue of consequential damages are denied.

SO ORDERED.