**MINIDOKA IRRIGATION DISTRICT,**
Plaintiff–Appellant,

v.

**DEPARTMENT OF THE INTERIOR, OF THE UNITED STATES; Manuel Lujan, Jr., Secretary of the Interior; Dennis Underwood, Commissioner of Reclamation; John W. Keys, III, Regional Director of Reclamation, Defendants–Appellees.**

No. 97–35341.

United States Court of Appeals,
Ninth Circuit.

Submitted June 2, 1998.

Decided July 30, 1998.

---

Beverly J. Singleman, Steve Hernandez, Hubert & Hernandez, Las Cruces, New Mexico, for Plaintiff–Appellant.

Robert Grisham, Assistant United States Attorney, Boise, Idaho, for Defendants–Appellees.

Before: LAY,* GOODWIN, and PREGERSON, Circuit Judges.

GOODWIN, Circuit Judge:

The Minidoka Irrigation District ("MID") appeals the district court's grant of summary judgment to the defendants. The district court found that the United States repudiated its contract with MID as early as 1963 and no later than 1985. MID claims that there are genuine issues of material fact making summary judgment improper. We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse and remand in part and affirm in part.

**Facts and Procedural Background**

The Minidoka Project is an irrigation project constructed by the Bureau of Reclamation (BOR) under the Reclamation Act of 1902. MID is one of two irrigation districts in the Minidoka Project; the other district being the Burley Irrigation District ("BID"). Construction of a power plant began in 1908, with completion of six generating units by 1927. The users of Minidoka Project water paid water charges that covered the return of the Project costs. The construction debt was fully repaid by June of 1964.

In 1926, Congress passed an act granting MID the right to receive benefits from Subsection I of the 1924 Fact Finders Act. Subsection I provided that MID (and BID) would be credited with any net profits derived from the operation of the power plant and the leasing of grazing and farm land.

In 1927, MID and BID entered into a contract with the United States reaffirming their right to the benefits of Subsection I. The 1927 Contract also grants MID a right to a credit for profits from the sale or rental of surplus water or from the connection of a new project with the existing one under Subsection J of the Fact Finders Act. The relevant language states that the Secretary of the Interior (the "Secretary") shall "determine and announce the total accumulated net profits to be credited under the [Subsections I and J of the 1924 Act] to the Minidoka Project." Appellee's Supplemental Excerpts of Record ("SER") at 30.

In 1963, the Secretary transferred the authority to market surplus power from the BOR to the Bonneville Power Administration (the "BPA"). At this time, BID entered into an amendatory contract with the United States where it gave up its claim to profits in return for a fixed annual credit. MID, however, chose not to sign this contract.

MID filed suit on December 10, 1991. After the Court of Appeals for the Federal Circuit found that the Idaho District Court had jurisdiction to hear MID's claims under 43 U.S.C. § 390uu, the district court granted summary judgment on the grounds that the six year statute of limitations under 28 U.S.C. § 2401(a) had run. MID filed this timely appeal.

* Honorable Donald P. Lay, Senior U.S. Eighth Circuit Judge, sitting by designation.

## Standard of Review

■ We review the district court's determination that the statute of limitations has run as a question of law. *Torres v. City of Santa Ana,* 108 F.3d 224, 226 (9th Cir.1997). On summary judgment, we view the evidence in the light most favorable to the nonmoving party to determine whether there are any genuine issues of material fact. *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1474 (9th Cir. 1997).

## Discussion

MID contends that as the United States must credit it with the profits from each year, the United States has an ongoing obligation to MID that creates a continuing claim. Thus, even if its claim to profits from years more than six year ago is barred, its claim to recent profits is not.

■ We need not decide, however, whether MID presents a continuing claim. Either the United States repudiated the contract-eliminating any continuing claims-or the United States did not repudiate the contract and the statute of limitations does not bar MID's claim for any of the disputed years. *See Trustees for Alaska Laborers–Constr, Ind. v. Ferrell,* 812 F.2d 512, 517 (9th Cir. 1987) (A contract that creates continuing obligations "is capable of a series of partial breaches or a single total breach by repudiation."). Simply put, the only question we must address in order to resolve the statute of limitations issue is whether-viewing the evidence in the light most favorable to MID-the United States repudiated its contract. We now turn to this question.

## I

The United States argues that it repudiated its contract in three letters it sent to MID between 1963 and 1985. It further claims that to the extent that these letters were ambiguous, its conduct combined with the letters clearly signalled to MID that it repudiated the contract. If so, the statute of limitations began to run upon the date of repudiation. As the latest possible date of repudiation is 1985, if the contract was repudiated, the six-year statute of limitations has run and all of MID's claims are time-barred.[1]

MID argues that it raised a genuine issue of material fact whether the United States repudiated the contract. To evaluate these arguments, we first review the law of repudiation. We then apply the law to the facts of this case, concluding that MID raised a genuine issue of material fact.

## A

■ Federal law governs Reclamation contracts by the United States. *Ivanhoe Irrigation Dist. v. McCracken,* 357 U.S. 275, 289, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958). Federal contract law is determined by reference to traditional common law principles. *First Interstate Bank v. Small Business Admin.,* 868 F.2d 340, 343 n. 3 (9th Cir.1989).

The Supreme Court has stated that to repudiate a contract, a party must make "a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time." *Dingley v. Oler,* 117 U.S. 490, 502, 6 S.Ct. 850, 29 L.Ed. 984 (1886). *See also United States v. Dekonty Corp.,* 922 F.2d 826, 828 (Fed.Cir. 1991) (Repudiation occurs when one party "absolutely refuses to perform his contract, and before the time arrives for performance distinctly and unqualifiedly communicates that refusal to the other party.") (quoting *Dingley,* 117 U.S. at 499–500, 6 S.Ct. 850); *Marr Enterprises, Inc. v. Lewis Refrigeration Co.,* 556 F.2d 951, 956 (9th Cir.1977)

---

1. MID brought suit for breach of contract, declaratory judgment, uncompensated taking in violation of the Fifth Amendment, breach of fiduciary duty and ultra vires. The district court dismissed all the claims as time-barred. With two exceptions, whether the district court erred turns on whether the United States repudiated its contract more than six years ago. *See Shiny Rock Mining Corp. v. United States,* 906 F.2d 1362, 1364–65 (9th Cir.1990) (Statute of limita-

tions begins to run on declaratory judgment action when party aware the government has taken an adverse position.); *Jones v. United States,* 9 Cl.Ct. 292, 295 (1985) (In suit for breach of fiduciary duty, statute of limitations does not begin to run until the trust relationship is repudiated.). The two exceptions are MID's claim for profits from leasing Project grazing and farm lands and MID's ultra vires claim. The next two sections discuss these other claims.

("[B]ecause the doctrine of anticipatory repudiation is viewed as working harsh results, for its application there must be a positive statement to the promisee ... indicating that the promisor will not or cannot substantially perform his contractual duties.") (internal quotations and citation omitted); Restatement (Second) of Contracts § 250 cmt. b (1981) ("In order to constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform.").

"Language that is accompanied by a breach by non-performance may amount to a repudiation even though, standing alone, it would not be sufficiently positive." Restatement (Second) of Contracts § 250 cmt. b. The conduct must be a voluntary, affirmative action, so mere delay in performance is not repudiation, nor is inability to perform due to incompetence or financial difficulties. E. Allan Farnsworth, *Farnsworth on Contracts,* § 8.21 at 479 (1990). *See also id.* ("Furthermore, courts have required that the act make the promisor's performance impossible, so that conduct that indicates mere unwillingness is not enough.").

■ In the Ninth Circuit, the question whether a party has repudiated is one of fact. *United Brotherhood of Carpenters v. Endicott Enterprises, Inc.,* 806 F.2d 918, 922 (9th Cir.1986) (" 'Whether sufficient notice of [repudiation] has been given raises a question of fact that requires an examination of the conduct of all parties.' ") (quoting *Contractors Health & Welfare Plan v. Harkins Constr. & Equipment Co.,* 733 F.2d 1321, 1326 (8th Cir.1984)).[2]

## B

With the law of repudiation before us, we turn to the facts of this case. First, we examine whether the letters sent to MID evidenced an unequivocal intent to repudiate the contract. Second, we ask whether the letters along with the conduct of the United States expressed a clear intent to repudiate the contract. We conclude that MID introduced enough evidence for a jury to find that the United States did not have such clear intent. Accordingly, the district court erred in granting the United States summary judgment.

■ The United States points to three letters-dated September 20, 1966 (Appellant's Excerpts of Record ("ER") Tab 50 Exhibit J); November 15, 1968 (ER Tab 50 Exhibit K); and March 28, 1985 (ER Tab 50 Exhibit N)-as evidence of repudiation. Although the letters do contain some language that suggests that the United States is repudiating the contract, when viewed in context, they fall short of unequivocal repudiation.

The language most favorable to the United States is in the 1966 letter. In that letter, the Regional Director of the BOR wrote that the transfer of the power marketing responsibilities to the BPA "preclude[s] the possibility of having any net power revenues from the operation of Minidoka Dam as an isolated plant." ER Tab 50 Exhibit J at 2. This statement could be interpreted as repudiation because only by knowing the net power revenues of the Dam could the United States determine the profits.

Yet viewed in the context of the letter and the ongoing conduct of the United States, the statement falls short of unequivocal repudiation. Earlier in the letter, the BOR explained that it would "be happy to assemble and present any [financial data] that you

2. The United States argues that while "what actions a repudiating party took presents a question of fact; [] whether such actions constitute a repudiation of the contract is a question of law." Appellee's Reply Brief at 29 (citing *Nuco Plastics, Inc. v. Universal Plastics, Inc.,* 76 Ohio App.3d 137, 601 N.E.2d 152, 154–55 (1991); *Rancho Pescado, Inc. v. Northwestern Mutual Life Ins. Co.,* 140 Ariz. 174, 680 P.2d 1235, 1240–41 (1984)). *Compare Local 92, International Assoc. of Bridge, Structural and Ornamental Ironworkers v. B & B Steel Erectors, Inc.,* 850 F.2d 1551, 1556 n. 6 (11th Cir.1988) ("Given undisputed facts, the district court on summary judgment and this court on appeal may draw the conclusion that as a matter of law an employer's conduct is or is not sufficient to repudiate."), *with Garcia v. Chase Manhattan Bank,* 735 F.2d 645, 648 (2nd Cir.1984) ("Whether Chase repudiated its obligations is a question of fact."), *and Battista v. Lebanon Trotting Assoc.,* 538 F.2d 111, 118 (6th Cir.1976) ("In our opinion [whether a letter effected repudiation] is a factual question for the jury to determine."). *Endicott,* however, rejects this proposition.

want." *Id.* at 1. It added that "[a]s can be seen from [the 1961] statement and as was explained clearly to both districts [MID and BID], there could be no net revenues available in the future by reason of the requirement for new investment." *Id.* at 1–2. In other words, the letter provides an alternate explanation for not crediting MID with profits; capital expenditures have eaten up any profits. The letter closes with another offer to provide any requested financial information and an offer to meet and review "this entire problem." This closing suggests that the United States wished to pursue the amendatory contract.

The subsequent letters are similar to the 1966 letter. The BOR explains that "there could be no net revenues available in the future by reason of the requirement for new investment." ER Tab 50 Exhibit K at 1. It then suggests that MID sign the amendatory contract to begin receiving annual credits of $1350. *Id.* Again, the mention that money spent on investments eliminates profits provide an explanation for the United States not crediting MID with profits. *See* ER Tab 50 Exhibit N at 2 (The BOR "intentionally stopped notifying the districts as to the lack of profits."). Because the United States need credit MID only when there are profits, this explanation could lead MID to believe that the United States is not breaching the contract. Moreover, these letters contained offers to account to MID. *Id.* at 3 ("If request by the district we can, at additional expense, have an audit performed."). These offers to account to MID are inconsistent with unequivocal repudiation.[3]

The United States also claims that "the Secretary of the Interior's transfer of the responsibility for marketing surplus power to BPA in 1963, and Congress' passage of the Transmission System Act in 1974, made performance impossible." Appellee's Reply Brief at 33. This transfer, it argues, was repudiation by conduct.

The 1963 Order does state that the BPA "shall interconnect and coordinate the federally-owned power generation and transmission facilities in the Snake river Basin with those in the rest of the Columbia River Basin in order to extend the benefits of uniform rate schedules and integrated power services to all parts of [its] marketing area." SER at 348. This passage could be understood as notifying MID that the BPA will spread costs across power generators, eliminating profits from the MID Project.

Nevertheless, viewing the evidence in the light most favorable to MID, there is a genuine issue of material fact. In the 1963 Order, the Secretary stated that the BPA "shall perform the functions delegated by this amendment in accordance the provisions of existing contracts." SER at 347. This language undermines the United States' claim of unequivocal repudiation.

Finally, the Transmission System Act of 1974 offers the strongest support for the United States argument that it repudiated the contract. In this legislation, Congress placed BPA in charge of marketing power in the Pacific Northwest. 16 U.S.C. § 838f. It directed the BPA in how to set rates. It stated that BPA should take into account: (1) "encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business practices," (2) cost recovery, (3) sufficient additional revenue to pay off bonds. 16 U.S.C. § 838g. This directive conflicts with the obligation to credit MID with profits.

Nevertheless, taking into account other legislation and other conduct, we conclude MID introduced sufficient evidence to create a genuine issue of material fact whether the United States repudiated the contract. The

---

3. It is useful to contrast these letters with a letter from the BOR to MID in 1991. In this letter, the BOR stated the federal legislation governing the Project "has no provisions for profits to be included in the power rates, only cost recovery, so no profit will be made from the power produces at Minidoka Powerplant in the future." ER Tab 54 Exhibit A at 2. This statement comes much closer to unequivocal repudiation. It clearly explains that the United States will never credit MID with profits because its rate structure eliminates the possibility of profits. A jury contrasting the previous letters with this clear statement could reasonably conclude that previous letters fall short of unequivocal repudiation. Of course, if the 1991 Letter repudiated the 1927 Contract, the statute of limitations had not run when MID filed suit.

Secretary stated in a press release announcing the transfer of marketing power to BPA in 1963 that the "Department [of Interior] emphasized that extension of the marketing area will not affect repayment arrangements between the [BOR] and irrigation districts." ER Tab 50 Exhibit G at 2. Moreover, the Senate report on the Act authorizing the Secretary to enter into an amendatory contract with MID stated that "[i]f the Minidoka water users do not approve an amendatory contract the present arrangement will continue." S.Rep. No. 1378, 87th Cong. 2d Sess. Finally, it is not clear that the pooled accounting done by BPA makes performance of contract impossible. If it does, the BOR's offers in its letters to give MID the relevant financial data make no sense. *See* ER Tab 50 Exhibit J at 1 ("As to financial data about power operations at Minidoka Dam, we will be happy to assemble and present any such information that you want."); ER Tab 50 Exhibit N at 3 (detailing costs for the MID Dam). If there truly were no profits, such accounting would seem to satisfy the United States' obligations.

**II**

The United States concedes that the district court erred in ruling that MID was time-barred from pursuing credits for profits from leases of grazing and farm land. Nevertheless, it urges that the grant of summary judgment was proper, as the undisputed evidence demonstrates that MID received these credits. *See Nugget Hydroelectric, L.P. v. Pacific Gas and Electric Co.,* 981 F.2d 429, 435–36 (9th Cir.1992) (This court can affirm a decision on any grounds supported by the record.).

■ The United States has submitted strong evidence to support its claim that it credited MID with the leasing profits. *See* SER 501–11 (Declaration of BOR Chief of Finance that MID was credited along with bills and spreadsheets reflecting credits); SER a 783–85 (same). MID claims that it has raised a genuine issue of material fact, because prior deposition testimony conflicts with these unsworn declarations. *See* ER Volume II Van Den Berg Deposition at 49 (stating that all income from grazing leases went to the U.S. Treasury), ER Volume II Rigby Deposition (stating that he did not know where the money from the grazing leases go). *But see* SER at 784 (Declaration of Van Den Berg that his deposition testimony did not mean "that MID had not received [the appropriate] credits").

While the evidence presented by the United States is strong, there is some conflicting evidence. On remand, should the United States present the district court with a satisfactory accounting, summary judgment may be proper.

**III**

■ Ultra vires claims generally allege that an official acted outside the scope of his authority. *See United States v. Yakima Tribal Court,* 806 F.2d 853, 859 (9th Cir. 1986). Here, MID has alleged that the United States has acted ultra vires. ER Tab 1 at 9. This is not a cognizable claim. *Id.* (An ultra vires claim "may be made only against the official and not against the United States."). MID has not alleged that any particular employee acted ultra vires. On these allegations, the district court properly dismissed the ultra vires claim.

**Conclusion**

Viewing the evidence in the light most favorable to MID, a genuine issue of material fact has been raised whether the United States repudiated its contract with MID. We reverse the district court's judgment that the statute of limitations bars MID's breach of contract claim, declaratory judgment claim, takings claim and breach of fiduciary duty claim. We affirm the district court's summary judgment in favor of the United States on MID's ultra vires claim. The case is remanded to the district court for proceedings.

REVERSED AND REMANDED IN PART; AFFIRMED IN PART. Appellant to recover costs.